THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WALTER JACKSON, Defendant-Appellant.

First District (1st Division)   No. 1—06—2787

Opinion filed March 30, 2009.—Rehearing denied June 17, 2009.

Michael J. Pelletier and Jonathan Krieger, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, Michele Grimaldi Stein, and Karisa F. Flores, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Defendant Walter Jackson was charged with two counts of financial identity theft (720 ILCS 5/16G—15(a) (West 2000)), two counts of theft by deception (720 ILCS 5/16—1(a) (West 2000)), and three counts of forgery (720 ILCS 5/17—3(a) (West 2000)), for his involvement in two residential real estate transactions, including the recording of a fraudulent quitclaim deed. Following a jury trial in the

circuit court of Cook County, defendant was convicted on all counts. The convictions were based on a theory of accountability. 720 ILCS 5/5—2(c) (West 2000). A sentencing hearing was conducted where mitigation and aggravation were presented. After finding that defendant's convictions on both counts for theft by deception and two counts for forgery merged with defendant's convictions for financial identity theft, the trial court sentenced defendant to three concurrent five-year terms in the Illinois Department of Corrections. Defendant now appeals arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) he was denied the effective assistance of counsel, (3) the trial court erred by denying his motion to quash his arrest and suppress evidence including a signed written confession, and (4) the State made improper closing arguments. We affirm.

## I. BACKGROUND

The State claimed that in the fall of 2002, Antwon Tillman (codefendant Tillman) wrongfully used the name and social security number of a Florida resident named Antoine Tillman (Florida Tillman), an Air Force training instructor, to purchase two homes in Cook County. After Florida Tillman reported to police that he did not purchase either property, prosecutors charged defendant and codefendant Tillman with financial identity theft, theft by deception, and forgery. The financial identity theft counts alleged that defendant "knowingly used the personal identifying information *** of another person" to obtain property and financing in two separate transactions: (1) a September 30, 2002, residential property closing where codefendant Tillman purchased the property located at 9713 South Prospect, Chicago, Illinois (South Prospect home), from defendant; and (2) an October 7, 2002, residential property closing where codefendant Tillman purchased the property located at 22992 Farm Trace Road, Richton Park, Illinois (Farm Trace home), from Andre Norris. The forgery charge pertained to the recording of a quitclaim deed and the indictment alleged that defendant "knowingly made or delivered a document *** apparently capable of defrauding another" when he recorded this quitclaim deed regarding the Farm Trace property in January 2004.

At trial, the State argued that defendant was accountable for the aforementioned offenses. Defendant argued that he was not accountable for codefendant Tillman's actions because there was no evidence that defendant was aware that codefendant Tillman had used another person's identity. The jury disagreed and convicted defendant on all counts.

### A. Events Leading Up to Trial

On September 30, 2002, defendant sold his South Prospect home for $285,000; more than four times the $61,000 he paid for the home's

purchase two years prior. At the time of the sale, it was encumbered by two outstanding mortgages totaling over $167,000 and was in foreclosure. The home was not listed on a multiple listing service prior to the relevant transaction.

Defendant, codefendant Tillman and Denna Adams, a closer with Law Title Insurance Company, were present at the closing of the sale of the South Prospect home; neither defendant nor codefendant Tillman was represented by an attorney. Adams acted as agent for the St. Francis Mortgage Company as well as Law Title Insurance Company and witnessed codefendant Tillman sign both the mortgage note and the closing documents. Codefendant Tillman signed all the closing documents with the name "Antoine Tillman" (the spelling used by Florida Tillman) and used Florida Tillman's social security number. Codefendant Tillman also used Florida Tillman's name and social security number to obtain a loan from St. Francis Mortgage Company for $285,000, the full purchase price of the South Prospect home. The loan application listed Florida Tillman as the buyer and listed his employment as general manager for Panda Industries in Lynwood, Illinois. It was later discovered after the real estate closing that Panda Industries did not exist and that the employment verification forms included in the closing packet were fraudulent.

At the closing, codefendant Tillman produced a driver's license bearing the name "Antwon L. Tillman" and his own photograph. While reviewing the closing documents, Adams observed that codefendant Tillman's first name was spelled differently on his driver's license than on the closing documents. As a result, Adams asked codefendant Tillman for additional identification. Codefendant Tillman produced a firearm owner's identification card and casino club card, both bearing the name "Antwon Tillman" and told Adams that he was known both as "Antoine [ ] Tillman" and "Antwon Tillman." Based on the discrepancy in the spelling of codefendant Tillman's name, Adams asked him to execute an affidavit certifying the different spellings in the affidavit and that "Antoine Tillman" and "Antwon Tillman" were the same person. Codefendant Tillman signed as "Antoine Tillman" and listed Florida Tillman's social security number.

Among the closing documents was an appraisal purportedly prepared by Eric Glenn, a licensed real estate appraiser who had worked with defendant in the past, which valued the South Prospect home at $285,000. Also included was a résumé bearing Glenn's name, but listing defendant's credentials. In addition, a $300 invoice for Glenn's appraisal services was presented for payment during the closing. Glenn, however, did not perform the appraisal, did not submit his résumé, did not submit the $300 invoice, and did not receive the $300 payment.

As a result of the sale, both of the outstanding mortgages on the South Prospect property were paid in full and the foreclosure proceedings dismissed. Express Mortgage, the mortgage brokerage that brokered the mortgage loan for the South Prospect home, received a $10,400 brokerage fee from the South Prospect closing.

On October 7, 2002, seven days after the sale of the South Prospect home, codefendant Tillman purchased the Farm Trace home from its builder, Andre Norris. During the weeks leading up to the Farm Trace purchase, defendant dealt with Norris in making selections for the home including carpeting, tile, and appliances. Defendant was not present at the Farm Trace home closing.

Present at the Farm Trace home closing were codefendant Tillman, Eugene Bennett, an attorney, Darryl Rogers, a mortgage broker with Express Mortgage, Andre Norris, and Edith Love, an escrow closer. Rogers obtained two loans from First NLC Financial Services, a first mortgage for $308,000, and a second mortgage for $77,000, together totaling $385,000, for the full contract price of the Farm Trace home. Codefendant Tillman utilized Florida Tillman's social security number during the closing. Codefendant Tillman also used Florida Tillman's personal information to obtain the two loans. Once again, the appraisal for the Farm Trace home indicated that Glenn had performed the appraisal.

Love, who witnessed codefendant Tillman sign the loan and closing documents, observed that certain closing documents spelled the buyer's first name as "Antoine" and others spelled it "Antwon" during her review of the closing packet. Although codefendant Tillman represented to Love that he was "Antoine Tillman," his driver's license, which Love photocopied, spelled his name "Antwon [ ] Tillman."

At the closing, Express Mortgage received $5,000 in brokerage fees and an additional $3,080 as a yield-spread premium, a fee often paid to a mortgage brokerage when a buyer pays a higher interest rate. A check was also disbursed to Glenn's address as the listed appraiser, but he never received the check.

Defendant was not present in the room during the closing, but was in the lobby of the building. On that date, defendant delivered several checks drawn on his personal checking account to certain parties to the closing. Defendant delivered two checks drawn on his personal checking account payable to Norris's company, A&E Construction, each made out for $5,000. Another check defendant delivered that day was for $3,000 payable to codefendant Tillman, which was also drawn on defendant's personal checking account. Although defendant later claimed this check was to cover overage

expenses, the closing documents did not indicate any overage expenses incurred by the buyer. After the closing, defendant moved into the Farm Trace home. Defendant later applied for a building permit to build a mailbox on the property. Defendant also made improvements to the home, and his fiancée, Brianne Blue, was listed as the account holder on the municipal water bill.

Later in October 2002, an advertisement was placed in a newspaper for the leasing of the South Prospect home. Carolyn Jones responded to the advertisement and met with defendant, who told Jones that he was the caretaker of the home for the owner, who was out of town. Defendant, Jones, and her husband entered into a lease for the South Prospect home entitled, "Lease with Option Purchase" under which the Jones family paid $2,400 per month to rent the home. While the contract provided for an option to purchase the property, the copy of the contract introduced at trial had the purchase option provision crossed out.

Jones, her husband, and their children noticed problems with the South Prospect home soon after they moved in. The furnace made a "booming" noise, the roof leaked when it rained, the electrical wiring and plumbing needed repair, the back steps were unsafe, and the basement leaked. At trial, Jones testified that her husband replaced the furnace and repaired the back steps, while defendant maintained that he replaced the furnace and repaired the back steps.

Pursuant to their lease agreement, the Jones family made the majority of their monthly rent checks payable to the order of "Express Mortgage and [defendant]," although three checks were made payable only to defendant. When the Jones family did not have the funds to pay the rent, defendant instructed them to make any payment they were capable of making to him and asserted that he would cover the remaining balance due.

In the summer of 2004, the Cook County sheriff's department informed the Jones family that the South Prospect home was under foreclosure and served them with a foreclosure lawsuit. As a result they ultimately had to vacate the premises. Jones first telephoned defendant, who assured her that he had paid the mortgage and that she should not be concerned. However, in July 2004, the sheriff's department evicted the Jones family from the South Prospect home. Following their eviction, the Jones family rented a neighboring home for $1,200 a month.

In March 2003, five months after closing on the Farm Trace home, codefendant Tillman executed a quitclaim deed for the Farm Trace home, again utilizing Florida Tillman's personal information. The deed conveyed all interest in the property from Florida Tillman to a LaSalle Bank Trust.

By July 2003, the mortgage on the Farm Trace home was delinquent. In an attempt to renegotiate the mortgage loan, defendant called First NLC Financial Services, "pretended to be Antoine Tillman," and provided the lender Florida Tillman's social security number. As a result of defendant's phone call, First NLC agreed to reinstate the delinquent loan. A letter memorializing the reinstatement of the loan was sent to the Farm Trace residence.

In December 2003, Florida Tillman received a notice of foreclosure from First NLC Financial Services for the Farm Trace home. Upon receiving the notice, Florida Tillman immediately contacted the Richton Park police department and filed a police report. Florida Tillman informed Richton Park police that he did not take out a mortgage on the Farm Trace property, nor did he authorize anyone to procure the mortgage loan.

On January 13, 2004, defendant recorded the quitclaim deed pertaining to the Farm Trace home he obtained in March 2003, which transferred all interest in the property from Florida Tillman to a LaSalle Bank Trust. The deed in trust established defendant and his fiancée the beneficiaries of the land trust for the Farm Trace home.

Following Florida Tillman's phone call to Richton Park police, Detective Gerlach was assigned to investigate a claim of financial identity theft. Detective Gerlach first conducted a water record check with the Village of Richton Park for the Farm Trace home and learned that Blue, defendant's fiancée, was listed as the account holder. Detective Gerlach also discovered that defendant applied for a building permit to build a mailbox on the Farm Trace property and signed the application as the owner. Based on this information, Detective Gerlach checked the arrest records of the Richton Park police department and discovered that defendant had been arrested by the Richton Park police for driving with a suspended license and informed them that he lived at the Farm Trace home. Detective Gerlach obtained the mortgage loan and closing documents for the Farm Trace home and learned that Florida Tillman was identified as the purchaser on those documents, as well as the account holder on the property real estate tax bill.

Detective Gerlach then interviewed Andre Norris of A&E Construction, the builder of the Farm Trace home. During the interview, Detective Gerlach showed Norris a photo array of six photographs, including one of defendant, and Norris positively identified defendant as the person who purchased the Farm Trace home.

On April 28, 2004, at approximately 8:45 a.m., Detective Gerlach and his partner went to the Farm Trace home. When defendant answered the door, Detective Gerlach informed him that he was

investigating a financial identity theft pertaining to the Farm Trace home and asked defendant if he would come to the police station for questioning. Defendant agreed and Detective Gerlach drove defendant to the station. Defendant was seated in the backseat of the police vehicle and Detective Gerlach's partner sat in the backseat with defendant. Defendant was not handcuffed.

At approximately 9 a.m., defendant and the detectives entered an unlocked interview room. Defendant was read his *Miranda* warnings prior to the commencement of the interview. According to Detective Gerlach, defendant was given *Miranda* warnings "in case he made any incriminating statements." Defendant affirmed his understanding of his rights and signed a waiver form to that effect. During this 50-minute interview, defendant originally denied any involvement in the financial identity theft. However, after being informed of the results of their investigation, defendant admitted to the detectives that he paid David Offit, of Express Mortgage, $10,000 cash to use "Antoine Tillman's" name and social security number for the purchase of the Farm Trace home. Defendant then signed a written consent authorizing the detectives to search the Farm Trace home. During the search of the Farm Trace home, Detective Gerlach and his partner recovered over 700 documents including: a mortgage note on the Farm Trace property bearing the name and social security number of Florida Tillman; a letter from First NLC Financial Services which indicated an attempt to renegotiate the mortgage loan on the Farm Trace home; defendant's résumé; and a résumé purportedly belonging to Eric Glenn, which attributed to Glenn all of defendant's credentials.

The detectives then returned to the police station and proceeded to interview defendant again. Defendant was again read his *Miranda* warnings and then shown some of the documents recovered from his home. Confronted with this evidence, defendant provided a confession that was later reduced to writing. In that confession statement, defendant stated that he worked as a residential appraiser for Express Mortgage from 2000 to 2003. He stated that in June 2002, Express Mortgage assisted him in selling his South Prospect home and he made a profit of $70,000 from that sale. Defendant stated that David Offit, a loan officer from Express Mortgage, informed him that the Farm Trace home was for sale. Defendant stated that he used the services of Express Mortgage, a company he knew to be dishonest, to help him purchase the $385,000 Farm Trace home. Defendant stated that he agreed to pay David Offit of Express Mortgage $10,000 cash in order to use "someone's credit and personal information to purchase the Farm Trace home" and stated that the personal information used to purchase the home belonged to "Antoine Tillman." Defendant's

statement detailed his involvement in the Farm Trace transaction including meeting with Norris and delivering checks for codefendant Tillman and A&E Construction. Defendant stated that after the closing he received the closing documents and moved into the Farm Trace home where he presently resided.

Defendant stated that he had failed to make any mortgage payments in seven months and had not paid the real estate tax bill on the Farm Trace home. Defendant further stated that in March 2004, he called NLC Financial and "pretended to be Antoine Tillman" and gave the lender Florida Tillman's social security number in order to reinstate the delinquent mortgage loan so that he could "stay at the house a little longer."

While defendant stated that he planned to have the Farm Trace home transferred into his name, he admitted that he recorded a quitclaim deed bearing the name of Antoine Tillman and, rather than transfer the home into his name, he transferred the home into a trust naming his fiancée, Brianne Blue, and himself as beneficiaries. Defendant expressed remorse for his actions and stated, "I know I was wrong for using someone else's credit and personal information. I am sorry [for] what I did."

Defendant was subsequently charged with financial identity theft, theft by deception, and forgery pertaining to the South Prospect and Farm Trace properties. Defendant was also charged with one count of forgery pertaining to the filing of the aforementioned quitclaim deed.

### B. Motion to Quash Arrest and Suppress Inculpatory Statements

On August 4, 2005, a hearing on defendant's motion to suppress his inculpatory statements and other evidence commenced before the trial court. In his motion, defendant argued that he was placed under arrest when Detective Gerlach arrived at the Farm Trace home on April 28, 2004, and that Detective Gerlach lacked probable cause to arrest him at that time. Defendant sought to have his statements, written confession, and any evidence recovered from the Farm Trace property suppressed.

At the hearing, Detective Gerlach testified regarding his investigation. Detective Gerlach testified that he spoke with Florida Tillman in January 2004, who stated that he was served with a mortgage foreclosure summons for the Farm Trace home in December 2003. Florida Tillman told the detective that he had never been to Richton Park and that he had not authorized anyone to purchase a home using his personal information. Detective Gerlach testified that he checked local municipal government records and found that Norris was the builder of the Farm Trace home and that defendant had applied for a

permit to construct a brick mailbox on the property. According to Detective Gerlach, Norris identified defendant from a photo array as being present at the Farm Trace closing and said that defendant called himself "Antoine Tillman" on several occasions.

Detective Gerlach testified that he and his partner went to the Farm Trace home in April 2004 and that defendant answered the door. Detective Gerlach testified that he asked defendant if he would come to the police station for questioning and defendant agreed. Defendant was seated in the backseat of Detective Gerlach's police vehicle with the detective's partner. Detective Gerlach drove the police vehicle to the police station.

Detective Gerlach testified that once at the police station he read defendant his *Miranda* warnings and defendant signed a waiver form waiving his *Miranda* rights. Detective Gerlach testified that defendant was not free to leave the station at that point. He interviewed defendant for approximately 50 minutes. Defendant initially denied any wrongdoing. After defendant was informed that Norris described him as impersonating "Antoine Tillman," defendant stated that he had paid Offit of Express Mortgage $10,000 to use "Antoine Tillman's" name and social security number to purchase the home. At the end of the interview, defendant signed a form consenting to a search of the Farm Trace property. After seizing documents from defendant's home, Detective Gerlach returned to the station and resumed questioning defendant, who provided the written statement.

In denying defendant's motion to suppress, the trial court found that defendant had not been involuntarily seized at his home. While the court noted that there was evidence to support arguments for or against seizure, it found controlling the facts that defendant was never handcuffed, that the police did not use weapons or in any way force defendant to accompany them, and defendant was never told that he was under arrest.

Additionally, the court found that even if defendant had been arrested at the home there was probable cause to support his arrest. The court noted that prior to interviewing Norris, Detective Gerlach learned that Florida Tillman was served with foreclosure documents for a home in Illinois which he never purchased; defendant was in possession of that home; defendant applied for a building permit for the home; defendant's fiancée was a named user on the water bill; and defendant had previously told the police he lived at the home. Norris then identified defendant as the purchaser of the home and indicated that defendant had identified himself as "Antoine Tillman." The trial court found that this information provided sufficient probable cause for defendant's arrest and therefore denied defendant's motion.

## C. Trial

The following evidence was presented at trial.

### 1. State's evidence concerning the South Prospect home

Denna Adams, a closer for Law Title Insurance Company, testified that she participated in a closing on September 30, 2002, in which St. Francis Mortgage Company lent "Antoine Tillman" $285,000 to buy the South Prospect home from defendant. Defendant and codefendant Tillman were both present, neither represented by an attorney. Codefendant Tillman presented Adams with a driver's license and state identification card listing the name "Antwon [ ] Tillman," which she photocopied. An investigator for the Illinois Secretary of State later testified that he was assigned to investigate records for one identification card and one driver's license, which appear to be identical to the ones photocopied by Adams, and testified that the man in those photos was codefendant Tillman. Codefendant Tillman also presented Adams with other identification cards listing different variations of both his first and last names. Adams observed the discrepancy in the spellings between the identification cards and the loan documents and requested that codefendant Tillman sign an affidavit attesting to the other names he used and that he was the same person using two different spellings.

Codefendant Tillman signed all the buyer's loan documents in Adams's presence, including the mortgage and a borrower's certification with the name and social security number of Florida Tillman.

Florida Tillman testified at trial and denied signing or initialing any of the loan documents. He also identified his name and social security number as being listed on forms and earning statements in the closing packet, but denied working for the Illinois employer listed on them.

Adams identified stubs for the checks disbursed, including checks to pay off the existing mortgage on the South Prospect home. Defendant was issued two checks, for $93,212.74 and $8,600. Express Mortgage, the mortgage brokerage, received a check for $10,400, which included a $7,500 broker's fee and $2,850 for a yield spread premium.

The parties stipulated that a senior vice president for the successor company to St. Francis Mortgage Company if called as a witness would testify that St. Francis Mortgage would not have made the mortgage loan for the South Prospect home "had it known that the true Antoine Tillman was not the borrower." The parties further stipulated to testimony that a résumé for Eric Glenn was submitted along with the appraisal report in the loan application. The parties stipulated that two résumés recovered from the Farm Trace home ap-

pear identical other than the name attached to the résumés; one résumé bore the name of defendant while the other bore the name of Eric Glenn.

Eric Glenn, an appraiser who had worked with defendant in 2001, testified he did not appraise the South Prospect home and did not sign the appraisal attributed to him in the closing packet. Glenn also testified that the résumé that was in the closing packet for the South Prospect home was not his, nor was it prepared by him.

The State introduced testimony from Carolyn Jones as to the events following the closing of the South Prospect home. Jones testified that she answered an advertisement in the Chicago Sun Times newspaper for a rental of the South Prospect home in October 2002. She and her husband met with defendant, who represented that he was the caretaker for the landlord Antoine Tillman, who was currently out of town. They signed a written lease for rental of the home for $2,400 a month. Jones testified that they agreed to a written lease with a purchase option and identified her copy of the lease, which was titled "Lease with Purchase Option." The provision for the purchase option was stricken and "N/A" was written in the margin next to the provision.

After moving in, Jones delivered her rent checks to defendant. Defendant instructed the Jones family to make money orders payable to Express Mortgage and occasionally to himself. Jones identified 38 money order stubs used to pay rent, with the most recent stub being July 2004. Of these, she identified three money orders payable to defendant. Although her testimony is not clear, Jones testified that defendant told her that when she was unable to pay all the rent, he would cover the difference, and that the money orders to defendant were for "back pay."

Jones described the South Prospect home as a large frame house in the Beverly neighborhood of Chicago which "looked nice, but needed some repair work." She testified that the furnace made a "booming" noise when it turned on, and her husband installed a new one. She also testified the roof leaked when it rained, the electrical wiring needed repair; the back steps were "raggedy and rickety"; the back door needed repair; and "[t]he plumbing wasn't the greatest." She testified on cross-examination that, before trial, the prosecutors had her list all of the problems with the house. Jones testified she did not know the average rent for that size house in that neighborhood, but that she was able to move into a neighboring home for $1,200 rent after vacating the South Prospect premises.

In the summer of 2004, a deputy sheriff served Jones with a foreclosure lawsuit. Jones testified that she telephoned defendant,

who represented that he paid the mortgage and that she should not be concerned. Another deputy sheriff later came and evicted the Jones family from the premises.

### 2. State's evidence regarding the Farm Trace home

Edith Love, a closer for Chicago Title Insurance Company, testified that she participated in a real estate closing on October 7, 2002, in which First NLC Financial Services lent "Antoine Tillman" $385,000 to buy the Farm Trace home from Andre Norris. Express Mortgage, the mortgage brokerage firm, received a $5,000 brokerage fee for obtaining the loan from First NLC Financial Services and $3,080 for a yield spread premium. Norris and codefendant Tillman both attended the closing.

Love asked codefendant Tillman for identification and he presented her with a driver's license bearing the name "Antwon [ ] Tillman." The driver's license appears to be identical to the one given by the buyer at the Prospect closing, with the same photograph identified by the Illinois Secretary of State investigator as depicting codefendant Tillman. Codefendant Tillman signed or initialed all of the loan documents, including a loan application and taxpayer identification request with Florida Tillman's social security number.

Florida Tillman denied signing or initialing the loan documents in the closing packet. He also identified his name and social security number as being listed on W-2 forms and earning statements in the closing packet, but denied working for the Illinois employer listed in them. Florida Tillman also denied involvement in the transaction.

Andre Norris, the builder of the Farm Trace home, testified that he met with defendant, a potential buyer who identified himself as "Walter Jackson," several times during the summer of 2002. Norris testified that he, his attorney, defendant, and Darryl Rogers of Express Mortgage attended the closing on October 7, 2002. Rogers found the buyer (codefendant Tillman) for the property. Defendant was not at the closing, but Norris observed him in the lobby of the building where the closing took place. Norris could not recall what the buyer looked like.

Norris testified that the Farm Trace home was priced at $395,000 and that loans covered $385,000, with defendant covering the remaining $10,000. Defendant also paid for appliances, which Norris testified was reflected as a seller's credit on the settlement sheet. Norris testified that the other similar houses in the development sold for between $380,000 and $390,000 and that an appraisal of $395,000 for the Farm Trace home was accurate.

The parties stipulated to the testimony of a branch manager for First NLC that it made two loans for $308,000 and $77,000 to "An-

toine Tillman" for the Farm Trace home on October 7, 2002. The parties stipulated that the manager, if called as a witness, would testify First NLC would not have made the loan if it knew "the true [Antoine] Tillman" was not the borrower.

Detective Richard Gerlach identified a handwritten statement he wrote for defendant in April 2004, which defendant initialed and signed. The statement was then offered into evidence and published to the jury. In the statement, defendant states that he worked as an independent contractor residential appraiser for Express Mortgage, a mortgage broker, from 2002 to 2003. While working for Express Mortgage, he "noticed they were a dishonest organization." David Offit, a loan officer with Express Mortgage, told him about the Farm Trace home and he paid Offit and someone who he thought was "Antoine Tillman" $10,000 to use Antoine Tillman's "credit and personal information to get [that] house." Express Mortgage brokered two mortgage loans to purchase the home. Defendant did not attend the closing but delivered a $3,000 personal check made payable to "Antoine Tillman." After the closing, Offit gave defendant the closing packet and keys, and he moved into the home.

After defendant failed to make several mortgage payments, he called the lender representing himself as "Antoine Tillman." He provided Florida Tillman's social security number in order to reinstate the delinquent loan. He stated that he wanted to stay in the house a little longer. Later he recorded a quitclaim deed transferring the title to the home in trust to himself and his fiancée, Brianne Blue, as beneficiaries. The written statement includes his statement that he knew it was wrong to use someone else's credit and personal information.

Darryl Phillips of the Cook County recorder of deeds identified a deed in trust which was recorded with the Cook County recorder of deeds on January 13, 2004. The deed conveyed any interest in the Farm Trace home from Antoine Tillman to LaSalle Bank as trustee under a written trust agreement. Detective Gerlach identified a March 12, 2003, agreement seized from the Farm Trace home establishing LaSalle Bank as trustee for the Farm Trace property and defendant and his fiancée as beneficiaries. When shown the quitclaim deed, Florida Tillman denied signing or initialing it, and testified he never conveyed the property to defendant and never had an ownership interest in the property.

The parties stipulated to the testimony of a project manager and document control manager for the successor company to First NLC. The stipulated testimony is that "[i]n July of 2003, a male identifying himself as [Antoine] Tillman called the lender and requested a repay-

ment plan as he was delinquent on the mortgage loans." On March 24, 2004, the lender sent an agreed repayment order to "Antoine Tillman" at the Farm Trace home. The parties also stipulated that the mortgages on the Farm Trace home went into foreclosure.

Detective Gerlach identified several documents seized in the search of the Farm Trace home, including a mortgage statement from the Farm Trace lender and commented that "somebody wrote down the victim's social security number and his age."

### 3. Defense evidence regarding the South Prospect home

Defendant testified that he had been a real estate appraiser since 1999, and that he had also rehabilitated two properties in Chicago and sold them for profit, while working as a Chicago public school teacher.

Defendant purchased the South Prospect home for approximately $65,000 at a Housing and Urban Development (HUD) auction. The property had "three feet of water in the basement and everything basically needed to be replaced." Defendant did a "gut rehab," removing walls, plumbing, and some electrical systems and installing new sinks, a new kitchen, bathroom fixtures, and tile. The remodeling took about a year and defendant lived in the property during that period.

Defendant testified that he decided to sell the South Prospect home. At the time he sold the home, it was in foreclosure. He testified that Express Mortgage found a buyer named "Antoine Tillman," who Darryl Rogers from Express Mortgage informed him was an investor. Defendant had not known codefendant Tillman before the closing. When asked whether he listed the home on the Multiple Listing Service (MLS), defendant testified that he did not. Defendant, codefendant Tillman, and Rogers all attended the closing. At the closing on September 30, 2002, the prior mortgages were paid off, and defendant was given two checks, one for $93,000 and one for $8,600. He endorsed the $8,600 check over to Rogers, who told him it was for closing costs. After the sale, a judgment of foreclosure was dismissed.

Defendant testified that he had worked with Eric Glenn. Glenn trained him on appraising multi-unit residential properties and he trained Glenn on appraising single-family residential properties. He identified the credentials on both his and Glenn's résumés as his own, and he testified he did not know how Glenn's name appeared on his résumé. Defendant had received the résumé from a closing packet and one of the résumés indicated it was faxed to St. Francis Mortgage, the lender in the South Prospect closing. He did not know who performed the appraisal for the South Prospect home.

At trial, defendant also addressed Carolyn Jones's testimony regarding the South Prospect home. He testified he installed a new

electric furnace because the Jones family could not obtain credit from the gas company. When defendant lived in the home, he had no problems with the previous gas furnace. The back stairs were "rickety" at some point because the Jones family hit one of the posts on the steps with a moving truck. Defendant had installed a new roof, but the snow would build up in the gutters, and, when it melted, would leak into the house. He installed electrical heaters on the edge of the roof line. He testified that there were some problems with the electricity but that they were corrected. On cross-examination defendant stated he did not bring receipts for any repairs he made to the South Prospect home.

Defendant testified he told Jones that he was not the owner of the property. Defendant collected rent from the Jones family for Express Mortgage because he was obtaining appraisal work from them, and they requested him to collect the rent. He explained that the checks from the Jones family payable to him were reimbursements for payments he made on their behalf. Express Mortgage threatened to evict the Jones family if they did not pay the full amount of the rent and defendant made their payments when the Jones family were unable to do so.

### 4. Defense evidence regarding the Farm Trace home

Defendant testified that Darryl Rogers told him about the Farm Trace home. They agreed to a deal whereby "Antoine Tillman" would buy the property "on paper" and, after 6 to 12 months, would quitclaim the property to defendant, who would refinance the loan. The buyer would be the same man who bought the South Prospect home. Defendant did not attend the Farm Trace home closing, but was in the lobby of the building where it took place. He brought a $3,000 personal check that Rogers told him was for overage fees. He also drew two $5,000 checks to A&E Construction, which Rogers told him were for closing costs. Although the quitclaim deed was to have been signed at the closing, it was not. After the closing, Rogers gave defendant the closing packet and keys to the Farm Trace home. Defendant and his fiancée moved into the home.

Defendant applied for a building permit to build a brick mailbox for the Farm Trace home and had contractors install mirrors on walls and marble and tile on the floors. He estimated that he spent $10,000 on these improvements. Defendant testified that Rogers represented to him that the monthly mortgage payment would be around $2,000, but it turned out to be about $2,500. Defendant testified that he sent eight or nine mortgage payments to First NLC Financial Services, which were deposited. He testified that one payment was returned.

Defendant testified that he asked Express Mortgage many times why it was returned, but did not receive an explanation. Defendant testified that he attempted to make further payments, but was not successful. Defendant testified that he called the lender and identified himself as a representative of the borrower and gave a social security number which matched Florida Tillman's. He testified that he attempted to obtain a payoff letter, so he could refinance the loan. During his testimony defendant never explained why he was unable to make further payments or unable to obtain the payoff letter.

Defendant testified that he telephoned Rogers numerous times and asked for the deed, which needed to be signed by the buyer Tillman. Eight or nine months after the closing, he received the deed, which he recorded with the Cook County recorder of deeds. He believed that filing the deed was necessary to refinance the property in his name. Defendant testified that he did not sign Tillman's name on the deed.

Tanshinik Harris testified she has been a notary public for eight or nine years. She was visiting her sister on March 12, 2003, who worked at Express Mortgage when someone asked if there was a notary in the office. She volunteered and notarized a quitclaim deed signed by "Antoine Tillman." She could not recall whose signature she notarized, but testified he must have shown her identification.

Defendant identified a copy of a land trust agreement which listed him and his fiancée as beneficiaries, and he testified that he believed it was a living trust, which he believed was a way to avoid probate. On cross-examination, defendant testified that he knew that the Farm Trace property was in foreclosure.

Defendant testified to voluntarily accompanying police officers to the police station in April 2004 and giving them permission to search the Farm Trace home. He testified that he signed the statement because the officer said he would be released if he did. Detective Gerlach did not allow him to write out his own statement, except for the last paragraph attesting to the truth of the statement. Defendant testified he did not know Express Mortgage was dishonest until the police told him they were.

On cross-examination, defendant identified several real estate tax forms seized from the Farm Trace home listing different social security numbers. He then identified a mortgage statement for the South Prospect home, which listed his personal social security number.

Eugene Bennett testified that he was the attorney for the buyer "Antoine Tillman" at the Farm Trace closing on October 7, 2002. Darryl Rogers of Express Mortgage had asked him to represent the buyer. Bennett testified that he did not see the buyer in the courtroom.

### D. Closing Argument, Verdict and Sentence

The State's closing arguments focused on accountability, charging that defendant was accountable for the actions of codefendant Tillman and Express Mortgage. The defense argued that defendant was the primary victim in this case and that defendant had no knowledge of codefendant Tillman's use of Florida Tillman's personal information. In rebuttal the State argued that defendant not only knew about codefendant's use of Florida Tillman's personal information but facilitated the crimes. The State also argued that Jones and Florida Tillman were the victims in the case at bar, not defendant. Defense counsel objected to arguments that Carolyn Jones was the "real victim," that mortgage fraud was a societal problem and that the jury needed to put a stop to it.

The jury convicted defendant on all counts. At the sentencing hearing conducted on September 14, 2006, defendant stated that he took "full responsibility" for his actions and was "truly sorry for [his] actions and associations." After finding that the counts for theft by deception and two of the counts for forgery merged as previously noted, the court sentenced defendant to five years' imprisonment on two counts of financial identity theft and one count of forgery, with the sentences to run concurrently.

## II. ANALYSIS

On appeal, defendant argues that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) he was denied the effective assistance of counsel, (3) the trial court erred by denying his motion to quash his arrest and suppress evidence including a signed written confession, and (4) the State made improper closing arguments. We address each of defendant's arguments in turn.

### A. Sufficiency of the Evidence

On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of financial identity theft and forgery. Specifically, defendant argues that the State failed to prove that he possessed the requisite intent to promote or facilitate a crime. Defendant claims that he did not share the criminal intent of codefendant Tillman and that the evidence was insufficient to prove him guilty of financial identity theft. Likewise, defendant argues that the evidence was insufficient to prove him guilty of forgery beyond a reasonable doubt.

The critical inquiry on review of a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v.*

*Cunningham*, 212 Ill. 2d 274, 278 (2004). Once defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that, upon judicial review, all of the evidence is to be considered in the light most favorable to the prosecution. *People v. Migliore*, 170 Ill. App. 3d 581 (1988). The trier of fact determines witnesses' credibility. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). We will not set aside a conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to defendant's guilt. *People v. Cox*, 195 Ill. 2d 378, 387 (2001).

As noted, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of both financial identity theft[1] and forgery.

■ As noted, defendant was convicted on all counts by accountability under section 5—2(c) of the Criminal Code of 1961 (720 ILCS 5/5—2(c) (West 2000)), which states:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

"Accountability is not a crime in and of itself but, rather, a mechanism through which a criminal conviction may result." *People v. Pollock*, 202 Ill. 2d 189, 210 (2002), citing *People v. Hicks*, 181 Ill. 2d 541, 547 (1998).

■ Viewing the evidence in this case in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The evidence in the case at bar established that codefendant Tillman utilized the name and social security number of Florida Tillman to first purchase the South Prospect home from defendant and then procure the Farm Trace home from Andre Norris, a home in which defendant resided after the purchase. The evidence also demonstrated that defendant remained intimately involved in the functioning of the South Prospect home after its sale. As noted, it was defendant who negotiated the terms of the lease with Jones and defendant who collected the Jones family's monthly rental payments after the home's purchase.

---

[1]Because we find the evidence of defendant's guilt in this case sufficient with regard to defendant's convictions for financial identity theft, we need not address the sufficiency of the evidence with regard to defendant's convictions for theft by deception and forgery, which were merged with defendant's convictions for financial identity theft.

A search of the Farm Trace home revealed many documents pertaining to the residential property transactions at issue in the case at bar, including a résumé including defendant's credentials bearing Glenn's name. As noted, it was this résumé that was included with the appraisal for the two homes.

The evidence also showed that defendant delivered payments drawn from his personal checking account to the closing of the Farm Trace home, although he was not a party to the closing. One of those payments was made to codefendant Tillman, for what defendant described as the use of "someone[']s" credit to purchase the Farm Trace home.

The evidence also demonstrated that defendant recorded the aforementioned quitclaim deed. As noted, the quitclaim deed purported to transfer all interest in the Farm Trace home from "Antoine Tillman" in trust to LaSalle Bank for the benefit of defendant and his fiancée, Blue.

Defendant testified that he was not aware that codefendant Tillman used another's personal identifying information to purchase both the South Prospect home and the Farm Trace home. He also testified that he had an arrangement with codefendant Tillman to use Florida Tillman's credit to procure the Farm Trace home and had an arrangement to procure a quitclaim deed a few months after the closing in order to refinance the mortgage and assume ownership.

The jury heard the testimony presented at trial including defendant's testimony and rejected it. Based upon the permissible inferences to be drawn from the evidence presented at trial, we find that a reasonable trier of fact could have found that defendant knew that codefendant Tillman used the personal information of Florida Tillman to purchase both homes and procure mortgage loans to that end. Likewise, we find that a reasonable trier of fact could have found that defendant knew that the quitclaim deed which he recorded was a forgery.

## B. Ineffective Assistance of Counsel

Defendant next argues that he received ineffective assistance of counsel at trial. Specifically, defendant contends that he was denied his right to effective assistance of counsel because trial counsel failed to object to the admission of other crimes evidence or evidence of other bad acts which demonstrated his propensity to commit the charged crimes. In the alternative, defendant argues that counsel was ineffective for failing to offer a limiting instruction regarding the introduction of other crimes evidence. Defendant argues that trial counsel's failures resulted in prejudice.

We begin our analysis of defendant's ineffective assistance of counsel claims by reiterating the oft-cited rules pertaining to a review of an ineffective assistance of counsel claim. The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007), citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious, as to fall below an objective standard of reasonableness; and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007), citing *Strickland*, 466 U.S. at 687-94, 80 L. Ed. 2d at 693-98, 104 S. Ct. at 2064-68.

Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135.

To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if in an effective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We do not need to consider the first prong of the *Strickland* test, when the second prong cannot be satisfied. *Graham*, 206 Ill. 2d at 476.

■ Defendant first argues that defense counsel was ineffective for failing to object to the testimony elicited from him during cross-examination that he made a practice of using other people's personal identifying information. On cross-examination, defendant was asked to identify various documents recovered from the Farm Trace home which identified him by name and utilized a social security number that belonged to another.

First, defendant argues that defense counsel was ineffective for failing to object to the testimony elicited from him during cross-examination that he made a practice of using other people's social security numbers in various real estate transactions. A review of defendant's direct examination demonstrates that the cross-examination was proper and that, even assuming it was not, any potential prejudice was cured when the trial court sustained defense counsel's objection to the State's line of questioning.

On direct examination, defendant testified that, prior to the arrival of police at his home in April 2004, he did not know "anything about any documents being phonied up by anybody." In response to this claim, defendant was asked on cross-examination about several real estate tax forms recovered during the search of the Farm Trace home. All of these forms listed defendant as the filer and all contained social security numbers, but only one of the forms listed defendant's actual social security number. These forms shed light on defendant's credibility when he claimed to have no knowledge of any "phonied up" documents before his arrest.

Defendant first identified a 2003 real estate tax form labeled "Proceeds From Real Estate Transactions" which listed his address as 10114 South Mella (actually Malta), Chicago, and pertained to a lot located at 509 LaMoille Road, Sublette, Illinois. The form identified defendant as the transferor and listed defendant's social security number as 318-**-****. Defendant originally testified that he did not know to whom the social security number belonged, but later stated that it probably belonged to his mother, as she owned a vacant lot in that area. Defendant also identified a 2003 Request for Taxpayer Identification form related to a property on Homewood Avenue in Chicago which was signed by defendant and listed his social security number as 320-**-****. Defendant testified that he did know to whom the listed social security number belonged, but stated that the property was "[p]robably a rental property at some point [he] had owned." Defendant identified another Request for Taxpayer Identification form listing defendant's name, a Chicago address, and a social security number of 333-**-****. Defendant admitted that he previously owned the property. While defendant initially disputed whether the nine-digit number listed in the social security number box was a social security number, he later denied knowing whose number was listed. Finally, defendant identified a mortgage interest statement pertaining to the South Prospect property which listed his name and his social security number.

Given his testimony on direct examination, the State was entitled to rebut defendant's claims of innocence and ignorance with contradic-

tory evidence, recovered from the Farm Trace home, that showed he personally "phonied up" such documents. See *People v. Johnson*, 368 Ill. App. 3d 1073 (2006). A trial is an adversarial proceeding. *People v. McKibbins*, 96 Ill. 2d 176, 189 (1983). Accordingly, a defendant who takes the stand on his own behalf not only offers himself as a witness, but also subjects himself to legitimate cross-examination. *People v. Burris*, 49 Ill. 2d 98, 104 (1971). The determination as to the proper scope of that cross-examination, including whether to allow the use of evidence of prior crimes, rests within the sound discretion of the trial court. *McKibbins*, 96 Ill. 2d at 189; *People v. Breton*, 237 Ill. App. 3d 355, 363 (1992). Subject to that discretion, the prosecution is entitled and obligated to use all of the impeaching evidence it possesses in order to impact the credibility of the defendant if he chooses to testify. *McKibbins*, 96 Ill. 2d at 189.

Furthermore, the reoccurrence of acts of the same sort are admissible to rebut or impeach a defendant's claims of accident, justification, or innocent intent and to provide evidence of necessary criminal intent. See *People v. Sutton*, 316 Ill. App. 3d 874, 892 (2000); *McKibbins*, 96 Ill. 2d at 185-86. In the present case, defendant's use of the other social security numbers occurred during the same time period as the charged crimes and therefore was admissible to rebut defendant's claims of lack of knowledge and demonstrate his intent to fraudulently use Florida Tillman's social security number and financial information.

Moreover, even if the questioning was improper, any error was cured when the trial court sustained defense counsel's objection. In a concluding question the assistant state's attorney asked, "So one out of four [social security numbers] is yours?" Defense counsel objected, arguing, "we don't know that the other ones are social security numbers, it's improper," and the trial court sustained the objection. The trial court's ruling on this objection, along with its later instruction to the jury to disregard questions to which objections were sustained, served to obviate any error. *People v. Wood*, 341 Ill. App. 3d 599, 610 (2003).

Defendant's next ineffective assistance claim regards defense counsel's failure to object to the testimony of Jones which, defendant claims, improperly suggested that he failed to maintain the South Prospect home and fraudulently rented the property. However, Jones's testimony was not intended to directly establish fraud, as defendant suggests, but rather was introduced to demonstrate that home's purchase price was not related to the condition of the home and to demonstrate defendant's continued involvement with the South Prospect home and codefendant Tillman.

In order to prove defendant guilty of financial identity theft regarding the South Prospect property, it was necessary for the State to establish that defendant was a knowing participant in the plan to defraud the bank who held the mortgage on the property by obtaining the loan through the use of Florida Tillman's personal information. First, Jones's testimony regarding the home's dilapidated condition demonstrated that the home was not worth the amount listed in the appraisal. As it was the State's theory at trial that defendant performed the appraisal himself, this goes to demonstrate his participation in defrauding the bank. Additionally, defendant's interaction with Jones after he was no longer an owner demonstrated that he was an active participant in the South Prospect home even after its sale. Jones's testimony established that defendant continued to be involved with codefendant Tillman. Moreover, Jones's testimony was part of the continuing narrative of the events surrounding the charge of financial identity theft and was therefore proper. *People v. Evans*, 373 Ill. App. 3d 948, 958 (2007). Because this evidence was proper, defense counsel was not ineffective for failing to object to it.

Defendant claims that the State failed to offer proof that these uncharged crimes occurred or that he in fact committed these other bad acts. However, while the State's proof must be more than mere suspicion, the State is not required to prove beyond a reasonable doubt that defendant committed an uncharged crime. *People v. Hansen*, 313 Ill. App. 3d 491, 500 (2000).

Defendant then claims that defense counsel was ineffective for failing to object to evidence suggesting that he committed other acts of fraud, specifically evidence that defendant forged a résumé used in both closings and that he used the personal information of Florida Tillman to renegotiate a loan. However, such evidence was part of the continuing narrative of the crime and, as such, was properly admitted to demonstrate defendant's intent and knowledge. Therefore, defense counsel was not ineffective in failing to object to such evidence.

Lastly, defendant claims that defense counsel was ineffective for failing to seek a limiting instruction. Defense counsel's choice not to seek a limiting instruction regarding other crimes evidence was purely a strategic decision made so as not to emphasize the evidence which, while proper, portrayed defendant in a bad light. Therefore, defense counsel's tactical decision cannot be the subject of a claim of ineffective assistance. See *Evans*, 209 Ill. 2d at 221. Furthermore, no such instruction was necessary where the evidence complained-of arose from the very same transaction or set of circumstances as the charged crime. *People v. Figueroa*, 341 Ill. App. 3d 665 (2003).

For the foregoing reasons, defendant cannot establish that defense counsel's performance was deficient. His *Strickland* claims necessarily fail.

## C. Defendant's Motion to Suppress

■ Defendant then argues that the trial court erred by denying his motion to quash his arrest and suppress evidence including a signed written confession.[2] Defendant argues that the trial court erred by denying his motion in light of testimony adduced at trial. Specifically, defendant argues that the police lacked probable cause to arrest him.

In the case at bar, the trial court found that defendant was not under arrest and was not involuntarily seized. Further, the trial court found that even if defendant were involuntarily seized prior to providing the inculpatory statements, the police had probable cause to arrest defendant. We agree.

In order to determine whether an arrest occurred, the court must decide whether "a reasonable, innocent person [would] consider herself arrested or *** conclude that she was not free to leave." *People v. Williams*, 164 Ill. 2d 1, 12 (1994). Courts look to a number of factors in deciding whether a defendant has been arrested, including the time and place of the encounter, the use of restraints, the beliefs of the officers and defendant, whether the defendant was transported in a police vehicle, and what the defendant was told by the officers. *People v. Washington*, 363 Ill. App. 3d 13, 24 (2006).

In finding that defendant was not involuntarily seized at the Farm Trace property, the trial court noted that there were factors which would support a finding of an arrest, including that a detective sat in the rear of the police vehicle with defendant, that defendant was immediately placed into an interview room and given *Miranda* warnings, as well as the detective's testimony that defendant was not free to leave when they arrived at the station. However, the trial court found more compelling the factors indicating that defendant was not arrested until after he made his initial oral admission 50 minutes into the first interview. Those factors included the fact that "there [were] no handcuffs, no display of handguns or any other weaponry, no indication of any force or more importantly no indication that the defendant did not himself feel he was not free not to go to the station or that he was not free to leave at any time. That was not communicated to him."

---

[2]We note that defendant did not argue at the trial level, and does not argue on appeal, that his inculpatory statements including a signed written confession were made involuntarily in violation of the fifth amendment.

We also find that defendant was not involuntarily seized until after making his initial oral admissions. Detective Gerlach and his partner went to the Farm Trace home where defendant answered the door. He was asked to accompany the police to the station and agreed to do so. Defendant was never handcuffed and no weaponry was displayed by the police. Based upon the foregoing and defendant's own testimony at trial that he voluntarily accompanied the police to the police station and did not feel that he was required to do so, we find that defendant was not involuntarily seized prior to making his initial oral inculpatory statements.

We also agree with the trial court's finding that the police had probable cause to arrest defendant, even if defendant was involuntarily seized prior to making his initial oral admissions.

A warrantless arrest will be deemed lawful only when probable cause to arrest has been proven. *People v. Robinson*, 167 Ill. 2d 397, 405 (1995), citing *People v. Tisler*, 103 Ill. 2d 226, 237 (1984). "Probable cause to arrest exists when facts exist that would lead a reasonable person standing in the shoes of the police officers to conclude that a crime has been committed and the defendant was the person who committed the crime." *Robinson*, 167 Ill. 2d at 405, citing *People v. Foster*, 119 Ill. 2d 69, 83 (1987). "Mere suspicion is inadequate to establish probable cause, but the evidence relied upon by the arresting officer need not be sufficient to prove guilt beyond a reasonable doubt or even be admissible at trial. Technical rules do not govern the assessment of whether probable cause existed; rather, practical, commonsense considerations guide that determination." *People v. Wilson*, 260 Ill. App. 3d 364, 368-69 (1994), citing *People v. Jones*, 196 Ill. App. 3d 937, 954 (1990), *appeal denied*, 133 Ill. 2d 565 (1990); *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983) (adopting a "totality of the circumstances" test for determining probable cause). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232, 76 L. Ed. 2d at 544, 103 S. Ct. at 2329.

Defendant argues that the police lacked probable cause to arrest him because the only direct evidence that the police had for probable cause to arrest him was provided by Detective Gerlach, who testified that Norris, the builder of the Farm Trace home had positively identified defendant as the buyer of the Farm Trace home and had described him as identifying himself as "Antoine Tillman." Defendant argues that Detective Gerlach's testimony was contradicted at trial, when Norris testified that defendant had identified himself as "Walter Jackson."

Viewing the totality of the circumstances in the case at bar, the police had probable cause to arrest defendant even without Norris's identification of defendant as impersonating "Antoine Tillman." When Detective Gerlach went to the Farm Trace home he knew that someone had purchased the home utilizing Florida Tillman's name and social security number and that the person was not Florida Tillman. Even without Norris's characterization of defendant as impersonating "Antoine Tillman," Detective Gerlach knew that it was defendant who met with the builder of the home several times, selected all the finishes on the home, and purchased appliances for the home. Accordingly, we find that there was probable cause to support defendant's arrest.

## D. Improper Closing Arguments

■ Finally, defendant argues that certain statements made by the prosecution during closing arguments deprived him of a fair trial. Defendant provides a myriad of arguments with regard to the prosecution's closing argument and argues alternatively that the errors collectively deprived him of a fair trial. We will address each of defendant's arguments in turn.

In reviewing defendant's allegations of error here, we first note that a prosecutor is allowed great latitude in closing argument (*People v. Stock*, 56 Ill. 2d 461, 467 (1974); *People v. Neumann*, 148 Ill. App. 3d 362, 373-74 (1986)), and the trial court's determination of the propriety of the argument will generally be followed absent a clear abuse of discretion (*People v. Smothers*, 55 Ill. 2d 172, 175 (1973)). "To constitute reversible error, the complained-of remarks must have resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different." *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987), citing *People v. Morgan*, 112 Ill. 2d 111, 132 (1986). "In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety and the complained-of comments must be placed in their proper context." *Cisewski*, 118 Ill. 2d at 175-76, citing *People v. Nemke*, 46 Ill. 2d 49, 59 (1970).

As a threshold matter, it should be noted that defendant has forfeited all but one of the four alleged areas of prosecutorial error raised on appeal. It is well established that in order to preserve an issue regarding closing argument for review, a defendant must object to the offending comments both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Wheeler*, 226 Ill. 2d 92 (2007). The purpose of this two-fold requirement is to allow the trial court the opportunity to address and correct errors if necessary. *Enoch*, 122 Ill. 2d at 186. To abandon this requirement

would allow appellate counsel to comb the record for every semblance of error and raise issues on appeal whether or not trial counsel considered them of any importance. *Enoch*, 122 Ill. 2d at 186.

Here, defendant failed to object to several specific remarks made during closing argument and failed to object to the alleged cumulative effect of the complained of remarks. Defendant also failed to include in his posttrial motion reference to all but one of the four alleged areas of error now complained of on appeal. Although defendant generally objected to the prosecutor's "improper and inflammatory closing argument" in his motion for a new trial, references in a posttrial motion to prejudicial and inflammatory remarks without factual detail is not sufficient to preserve the issue for review. *People v. Flax*, 255 Ill. App. 3d 103, 108 (1993).

Defendant acknowledges that certain comments were not objected to. He does not ask this court to review these remarks under a plain error analysis. Rather, defendant argues that the comments which might otherwise be subject to forfeiture must be considered as a part of the entirety of a prosecutor's closing argument for purposes of determining prosecutorial misconduct.

Defendant misstates the law. While closing arguments must be viewed in their entirety, statements which are not properly objected to are forfeited and thus, their use is limited merely to "add to the context of a remark properly objected to." *Wheeler*, 226 Ill. 2d at 122-23.

In defendant's only claim not subject to forfeiture, he argues that the prosecutor in rebuttal closing argument improperly focused the jury's attention on the growing trend of mortgage fraud. However, a review of the entire closing argument reveals that the prosecutor's comments were proper as they focused on the facts in evidence rather than on general notions of deterrence and were invited by defense counsel's argument.

Defendant identifies three comments made by the prosecution in rebuttal closing argument which he claims were improper. First, defendant argues that the prosecution's comment, "that's what they are doing on these mortgage fraud scam cases. That's what they are doing on identity theft these days. That's how sophisticated it is, and that's why we are asking you to help us stop it." Defendant does not consider the paragraph immediately preceding the remark which, when read in conjunction with the complained-of comment, clearly demonstrates that the prosecution was referring specifically to defendant and codefendant Tillman. Although this comment was objected to, it was not improper as defendant would suggest. Preceding the comment, the prosecution argued:

"[Defendant] is working with Express Mortgage. They have access to people's credit. They choose people with the same names. The codefendant is Antwon Tillman. His name is [Antoine] Tillman. What easier way to try to wiggle out of this when you're profiting this kind of money than to pick a victim who has the same name as you? And say, oh, it's all a mistake, or I didn't know. How was I supposed to know? That's what they are doing on these mortgage fraud scam cases. That's what they are doing on identity theft these days. That's how sophisticated it is, and that's why we are asking you to help us stop it."

From the foregoing, it is clear that the complained-of comment pertained to defendant and codefendant Tillman and not "unspecified criminals" as defendant suggests. The prosecution argued that defendant and Express Mortgage used a local straw man, codefendant Tillman, with similar names as Florida Tillman whose financial identity was stolen to perpetuate the aforementioned residential real estate transactions.

Defendant then argues that the prosecutor's use of the term "scam artist" to describe defendant deprived him of a fair trial. This term was utilized to describe the defendant as what the prosecution hoped the evidence would demonstrate. The Illinois Supreme Court recently upheld the use of such terms when the evidence presented at trial supports it. *People v. Perry*, 224 Ill. 2d 312, 350 (2007). In *Perry* the court rejected an improper closing argument claim where the prosecutor described the defendant therein as a "con man," a "fraud" and a "fake." *Perry*, 224 Ill. 2d at 350. In so doing, the court noted that "[d]escribing a defendant who is charged with theft by deception as a con man, fraud, or fake is similar to describing a defendant who is charged with murder as a killer or a murderer." *Perry*, 224 Ill. 2d at 350.

Defendant then argues that the prosecutor's comment stating that "identity theft and mortgage fraud identity theft is the fastest growing crime in our country *** we hear about it more and more" deprived him of a fair trial. Defendant objected to the comment but his objection was overruled. However, when defendant objected to prosecution's next comment that "you hear more about it these days," his objection was sustained curing any possible error. *People v. Miller*, 363 Ill. App. 3d 67, 78 (2005).

Defendant's reliance on *People v. Johnson* in support of his argument is misplaced. *People v. Johnson*, 208 Ill. 2d 53 (2003). In *Johnson*, the prosecutor improperly appealed to the jury to "send a message" of support to law enforcement and to society in general, likened the defendants to animals, cast the prosecution in terms of "good versus

evil," mischaracterized evidence and the law, and suggested that defense counsel engaged in deceptive tactics. *Johnson*, 208 Ill. 2d at 78-80. The court reversed the defendants' convictions based on the cumulative effect of the improper comments and the pervasive pattern of unfair prejudice. *Johnson*, 208 Ill. 2d at 79.

The complained-of comments in the instant case find no comparison to the objectionable comments in *Johnson*. The remarks in the present case were not an "extended and general denunciation of society's ills" but rather isolated remarks relating to the jury's ability to effect specific and general deterrence based on defendant's culpability.

Defendant then argues that the prosecutors inflamed the passion of the jury by arguing an uncharged crime against Carolyn Jones. Specifically, defendant points to three comments which he argues were improper. Namely, the prosecution's comment that Jones was a victim, that defendant "ripped Jones off," and that defendant was greedy.

Defendant first claims that the prosecution focused much of its closing argument on portraying Jones as a victim. However, a review of the record demonstrates that this is not true. Jones was mentioned at the opening of the prosecution's opening portion of their closing argument. The prosecution began its closing argument by stating, "[a] victim? Do you know who the real victim is? He's sitting right out there. It's the banks, Carolyn Jones. Those are the real victims." This comment was properly made to rebut defendant's theory at trial that he was the true victim in this case.

Jones was mentioned shortly thereafter but only in regards to the fact that defendant was not a victim, but was in court because of the intentional way he had chosen to commit the crimes with which he was charged. The prosecution argued, "[defendant] made the choice to go to Express Mortgage. He made the choice to be partners with them. He made the choice to be partners of Antwon Tillman, the codefendant. He made the choice to get the sales land contract signed with Carolyn Jones. He made the choice to tell her everything is ok. Don't worry." Defendant objected claiming that he was not charged with a crime against Jones. However, the prosecution did not argue that defendant committed a crime but that defendant was involved with Jones despite the fact that he no longer owned the South Prospect home.

Jones is not mentioned again in the transcript from closing argument until eight pages later where the prosecution urged the jury to consider her testimony and use it to assess defendant's credibility. Specifically, the prosecutor asked the jury to recall Jones's testimony regarding the problems she experienced with the South Prospect home and compare it with defendant's testimony regarding the alleged

improvements to the home. The prosecutor's comment was proper as the credibility of a witness is a proper subject for closing argument if it is based on the evidence or inferences drawn from it. *People v. Gorosteata*, 374 Ill. App. 3d 203, 223 (2007). Jones was not mentioned again during opening closing argument. In all, only three brief references to Jones were made during an argument that spans 35 pages of transcript.

During defendant's closing argument, Jones was discussed several times. Defense counsel argued that if defendant was a "thief, a forger, a swiper of identities" he would not have collected rents from Jones in his own name. Defense counsel also argued that the State bolstered the import of the evidence that defendant fronted some of his own money to help Jones when she could not pay all of the rent. Defense counsel argued that defendant was "good-hearted by fronting some of her rent money to Express Mortgage who's putting the squeeze on her" and now the prosecution was "taking advantage" of defendant for helping Jones and trying to use that against him.

In rebuttal, the prosecutor referred to the testimony of Jones first as it related to defendant's credibility regarding the alleged improvements to the South Prospect home. The prosecutor asked the jury, "[w]ho are you going to believe?" The prosecutor's comment that Jones "put a lot of money into that house, and [defendant] ripped them off" was also directed to the credibility of the witnesses, not with any uncharged crimes committed by defendant against Jones. It was intended to highlight Jones's testimony that the condition of the South Prospect home did not warrant the high rent and that defendant's testimony that he made improvements to the home was not credible.

Jones was again mentioned with regard to defendant's claim that some of the problems with the condition of the South Prospect home were attributed to the Jones family and not to him. Contrary to defendant's claim, the prosecutor did not discuss defendant's crimes against Jones. Rather, the prosecutor argued that defendant blamed everyone else and perceived himself as the victim. The prosecutor's assessment was proper as it went to defendant's credibility. See *Gorosteata*, 374 Ill. App. 3d at 203.

Jones was later mentioned to corroborate the State's claim that defendant knew that the true Antoine Tillman lived in Florida, based on codefendant Tillman's license presented at both closings which indicated a Chicago address. The reference to Jones also rebutted defense counsel's argument during closing that defendant collected rent for codefendant Tillman because he lived out of state.

The only part of the prosecutor's rebuttal closing which arguably deals with crimes against Jones is the comment that, "[d]efendant is so greedy on Prospect that he signs a contract with Jones to lease it with an option to purchase" and "[s]he ends up losing all of that money." The prosecution was rebutting defendant's closing argument by showing how the facts demonstrated that defendant was a willing participant in these crimes, not an innocent victim that was "duped."

Defendant then argues that certain remarks made by the prosecution were not supported by facts and that the prosecution effectively created circumstantial evidence of intent where none existed. Specifically, defendant takes issue with the prosecution's comments regarding the lack of attorneys at the South Prospect closing or at the filing of the quitclaim deed, defendant's failure to list the home on a MLS, and the comment that most houses do not sell in seven days. Again, defendant has forfeited review of this claim by failing to object at the trial level. Nonetheless, defendant's claim fails. All of these comments were legitimate inferences to be drawn from the evidence.

Defendant argues that the State improperly drew negative inferences based on the absence of attorneys at the South Prospect closing where the State failed to introduce "evidence regarding the significance of parties appearing unrepresented at a closing." Contrary to defendant's argument, the State was not required to introduce evidence regarding the significance of parties being unrepresented at closings before it was permitted to comment on the reasons why defendant would choose not to use an attorney.

The same is true regarding defendant's filing of the quitclaim deed without the assistance of attorney. Based on the circumstances regarding that transaction, the State properly argued the legitimate inference that defendant chose not to involve an attorney in that transaction so as to avoid the discovery of the forged deed.

Defendant also asserts that the State improperly commented on defendant's failure to list the South Prospect home on a MLS where no testimony was introduced regarding listing services. In opening closing argument, the prosecutor asked the jury whether defendant ever listed the South Prospect home on a MLS, which defendant admitted that he did not at trial. In rebuttal argument, the prosecutor argued, "Wouldn't you like to do that? Wouldn't it be nice to be in foreclosure and seven days later sell your house and make a hundred thousand dollars profit? Without even putting it on the MLS?" The prosecution's argument was based upon common sense and life experience, factors which the jury was instructed to keep in mind when considering the evidence. See *People v. Beard*, 356 Ill. App. 3d 236, 241 (2005) (found no error in the prosecution's argument that a particular

individual " 'simply would not have the strength to have caused' " the victims injuries and noted that the prosecution is permitted to discuss subjects of general knowledge, common experience, or common sense).

Defendant then argues that the State's comment regarding defendant's ability to sell the home in a relatively short time was improper because no testimony was introduced regarding real estate practices. Again, defendant isolates the complained-of comment out of its proper context. During rebuttal argument, the prosecutor argued, "[m]ost houses take longer than seven days to sell, ladies and gentleman of the jury, especially [one in] the condition that Carolyn Jones said it was in, not as fast as seven days. And the only reason it happened that way is because [defendant] went to *** Express Mortgage because he knew that they were dishonest." The State's argument regarding the speed of the sale was a matter of common experience which the prosecution was entitled to address. As such, the State was not required to introduce specific testimony on this point before making this argument.

Defendant then argues that prosecutors improperly assessed his credibility and the credibility of defense counsel by interjecting their personal opinions. Defendant has forfeited this claim on review. Nonetheless, a review of the State's closing argument reveals that the complained-of comments were proper.

For a prosecutor's closing argument to be improper, he must "explicitly state that he is asserting his personal views." (Emphasis omitted.) *People v. Pope*, 284 Ill. App. 3d 695, 707 (1996). Appellate courts are unwilling to infer that a prosecutor is injecting his personal opinion into an argument where the record does not unambiguously say so. *Pope*, 284 Ill. App. 3d at 707. Furthermore, a witness's credibility is the proper subject of closing argument if it is based on the evidence or reasonable inferences drawn from the evidence. *People v. Dresher*, 364 Ill. App. 3d 847, 859 (2006).

Defendant argues that the prosecutor "ridiculed" defendant's understanding of land trusts to avoid probate when he argued, "[o]bviously, [defendant] doesn't know what a quitclaim deed is because he's up on the stand hemming and hawing about land trust survivorship and blah-blah-blah." Contrary to defendant's claim, the complained-of comment was not a personal opinion but rather a permissible comment regarding defendant's credibility. *Dresher*, 364 Ill. App. 3d at 859. The prosecutor's comment challenged defendant's testimony that, despite his extensive experience in real estate, he did not understand the implications of a land trust.

Next, defendant argues that the State's argument in rebuttal that Eric Glenn's résumé was found in defendant's home was not a copy as

defendant testified but was the original as evidenced by the fact that the résumé had correction fluid on it. This argument was proper to rebut defense counsel's argument that Express Mortgage, not defendant, created the fake résumé.

Furthermore, the State's comment properly challenged the credibility of defendant's testimony that the résumé was a copy given to him after the closing. Because defendant's testimony conflicted with other evidence presented at trial, the State properly challenged his credibility during closing argument.

Defendant also claims that the prosecutor injected her personal opinion and again takes the complained-of comment out of context. The prosecutor argued, "[defendant] created that résumé, and it was found in his house as part of the loan packets that were sent to lenders. He participated in this crime. He's an appraiser. He made fake appraisals. That's what this man did. And right now he is looking at me like that because he can't stand the truth." Contrary to defendant's claim, the prosecutor's comment regarding defendant's physical appearance was not a personal opinion and was completely proper. Faced with a cold record, it is unknown what, if any, facial expressions and physical gestures defendant performed for the jury or what body language defendant exhibited. The prosecutor's comment may have been a reaction to defendant's attempt to sway the jury with his body language. Commenting on a defendant's appearance during closing argument is implicitly recognized as falling within the bounds of legitimate argument. *People v. Byron*, 164 Ill. 2d 279, 296-97 (1995) (comment made during closing argument that the defendant, when facing trial for murder, grew a beard, put on glasses, and " '[l]ooks like the county jail librarian because that's not what a murderer is suppose[d] to look like,' " did not substantially prejudice the defendant warranting reversal).

Defendant then claims that the prosecution's statement that attorney Eugene Bennett was "paraded" to the stand was an improper personal opinion directed at defense counsel. During opening closing argument, the prosecution argued that defendant called Eugene Bennett as a witness in an attempt to add credence and a sense of legitimacy to the Farm Trace transaction. The prosecution went on to argue, that "[defense counsel] is trying to say [defendant's] so clean. My guy didn't do anything. Look, there was a lawyer at the second closing. Could my client know anything was wrong?" The prosecution further argued that no attorney was present at the South Prospect closing or at the quitclaim deed transaction "[b]ut [defense counsel] will parade one attorney up for you on the second closing to say that [defendant] didn't know anything."

These comments did not constitute personal opinion or disparage defense counsel. Rather, the complained-of comments were responses to the defense's theory and had nothing to do with defense counsel. See *People v. Ligon*, 365 Ill. App. 3d 109, 124 (2006) (court held that calling defense counsel's argument "ridiculous," "sad," and "pathetic" was a comment on defendant's credibility and his theory of defense rather than an impermissible attack on defense counsel).

Finally, defendant claims that the cumulative effect of the improper closing arguments deprived him of a fair trial. However, having found defendant's individual arguments with respect to the closing arguments unpersuasive, we also find defendant's argument as to the cumulative effect of the closing argument unpersuasive.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

WOLFSON and HALL, JJ., concur.