# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Gomez*, 2011 IL App (1st) 092185

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARLOS GOMEZ, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-09-2185 |
| Filed | September 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions and sentences for first degree murder, aggravated criminal sexual assault and home invasion involving a 63-year-old woman were upheld over his contentions that his motion to quash his arrest and suppress his statements was improperly denied, the State failed to prove the victim was alive when she was assaulted, the trial court violated Supreme Court Rule 431(b), and the sentence of natural life imprisonment for first degree murder was an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 01-CR-811; the Hon. Jorge Luis Alonso, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Geoffrey Burkhart, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion. Justices Cahill and Garcia concurred in the judgment and opinion. |

## OPINION

¶ 1 Following a jury trial, defendant Carlos Gomez was convicted of the first degree murder, aggravated criminal sexual assault and home invasion of Joyce Ralson. The trial court subsequently sentenced defendant to a term of natural life for first degree murder, 30 years for aggravated criminal sexual assault and 30 years for home invasion. Defendant appeals, arguing that: (1) the trial court erred in denying his motion to quash arrest and suppress statements because defendant was arrested before the existence of probable cause; (2) the State failed to prove him guilty of aggravated criminal sexual assault beyond a reasonable doubt because it did not establish that Ralson was alive at the time of the sexual assault; (3) the trial court failed to comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); and (4) the trial court abused its discretion in sentencing defendant to a term of natural life.

¶ 2 In November 2004, defendant filed a motion to quash arrest and suppress evidence flowing from an unlawful detention. The trial court conducted a hearing on defendant's motion in January and February 2005. The following evidence was presented at the hearing.

¶ 3 Maria Gomez Bahena testified that she is defendant's sister. On November 22, 2000, she was living at her parent's house, located at 3774 West 77th Place in Chicago, with her family. On November 23, 2000, which was Thanksgiving, between 4:30 a.m. and 5:30 a.m., Bahena was sleeping on the couch in the living room when she was awoken by "loud banging and knocking" at the side door. She went to the door and looked through a curtain to see "quite a number of what [she] thought were police officers." They asked to see defendant. She opened the door slightly and they asked about defendant. Bahena told them he lived there and was sleeping in the basement. The officers said they needed to see him and Bahena asked them to wait and closed the door. She turned to get her parents, but her mother was already at the doorway to the stairs by the side door. As Bahena turned around, the officers entered the house and walked down the stairs into the basement. Bahena denied giving the officers permission to enter the house.

¶ 4 Bahena testified that at least five officers went down the stairs. She followed them with

her mother. Bahena stated that the lights were off in the basement and it was dark so the officers used their flashlights. Bahena said there was a bunk bed in the basement. The officers approached the bunk bed and started questioning her brother, Jesus, who was in the bottom bunk. They asked him if he was Carlos and made Jesus show them his identification to prove he was not Carlos. Then, the officers grabbed defendant and pulled him down from the top bunk. Bahena stated that they handcuffed defendant. Bahena testified that defendant was wearing his pajamas, which were jogging pants and a white T-shirt. He was not wearing shoes, only socks. One of the officers then read defendant his rights. The officers then "dragged" defendant out of the house. An officer came back and took a pair of shoes for defendant.

¶ 5    While the officers were there, Bahena tried to explain what was said to her mother, who only spoke Spanish. They asked for a Spanish interpreter and Bahena stated the officers ignored them and one said to her mother that she lives in America, she should be speaking English. The officers also responded that the people who speak Spanish were not working that day. Bahena stated the officers commented that "You Mexicans don't celebrate Thanksgiving anyway." Bahena said the officers were laughing and telling jokes. The officers were also taking pictures of the basement and at one point took a picture of her mother. Bahena testified that the officers did not tell her they had a warrant to search her house or a warrant for defendant's arrest.

¶ 6    On cross-examination, when asked if there were four officers present, Bahena responded that at least five came into the house and more were outside. She stated that the officers did not ask to enter the house and she did not give them permission. She did not remember one of the officers giving her his card, but said that she asked where they were going and was told Area One. Bahena was asked why she did not tell other detectives and an assistant State's Attorney about the actions by the officers, and she responded that she was not asked. Bahena was referred to part of her written statement in which she stated that the officers were "rude to her at her home earlier and made what she believed to be racist remarks." On redirect, Bahena clarified that she was not asked in her statement about what occurred when the officers came to her house, but was asked about the events that took place the night before. In rebuttal, Bahena testified that in November 2000, she was employed by a market research company and denied asking the police officers about the educational requirements to become an officer.

¶ 7    Jesus Gomez testified that defendant is his younger brother. In November 2000, he lived at 3774 West 77th Place with his family. He slept in the basement with defendant on a set of bunk beds. He stated that between 4:30 a.m. and 5:30 a.m. on November 23, 2000, he was awoken by a flashlight in his face and a bunch of men surrounding him asking for defendant. He had been sleeping in the bottom bunk. He tried to get out of bed, but the officers would not let him and asked him to show his hands. They asked for his identification and he indicated that it was in his pants near the bed. The officers got the pants and "threw" the pants at him and told him to get his identification. Jesus took out his identification and showed it to the officers.

¶ 8    Jesus testified that the officers then went toward defendant on the top bunk. He saw two officers drag defendant out of bed. He stated that the officers asked defendant if he was a

Latin King and they handcuffed him and read defendant his rights. Jesus said there was a lot of commotion because several of the officers were searching the laundry and storage rooms and some were on radios and cell phones. The officers then took defendant upstairs without any shoes. An officer came back and took a pair of shoes. Jesus said he never heard the officers say they had a warrant to search the house or a warrant for defendant's arrest.

¶ 9        On cross-examination, Jesus admitted that he was not near the door when the officers entered the home and did not know how they entered the home. Jesus stated that there were probably up to 10 officers in his house. He said the officers did not announce themselves and he did not see their badges. Jesus testified that the officers argued with his sister.

¶ 10       Maria Gomez testified with the aid of an interpreter. She stated that she is defendant's mother. She stated that in November 2000, she lived at 3774 West 77th Place with her family. On November 23, 2000, between 4:30 a.m. and 5:30 a.m., she was sleeping in her bedroom when someone knocking on the door woke her up. She got up and went to see what was happening. She saw some officers enter through the side door and go downstairs. Her daughter was behind the officers and Maria also went downstairs. She stated that officers used flashlights downstairs and someone turned on the light. The officers were yelling, but she did not understand because she does not speak English. She said the officers "threw" defendant off the bed and handcuffed him. The officers left with defendant. When she asked what was happening, the officers "didn't want to tell [her] anything."

¶ 11       The defense rested its case-in-chief on the motion. The State then called its witnesses.

¶ 12       Detective Ernest Turner testified that on November 22, 2000, he was assigned to Area One as a homicide detective. He was working the first watch from 11 p.m. until 7 a.m. Shortly after 11 p.m. on November 22, 2000, he received an assignment and went to a scene located at 3777 West 77th Street. Detective Turner stated that it was a murder scene involving an elderly woman named Joyce Ralson. He spoke with the police officers on the scene and learned of a witness named Robert Ralson who also lived at that location and was the brother of the victim. Detective Turner found out that Robert had seen the individual on the premises and that while exiting the premises, the offender knocked Robert down and fled west. He received a description of the offender as a male white, between 5 feet 9 inches and 5 feet 11 inches, dressed in a black jacket with white lettering, black pants, black hair with a short haircut.

¶ 13       Detective Turner also learned of a battery victim that another beat officer had answered near 3822 West 76th Street around the same time as the homicide and the battery victim had been taken to Holy Cross Hospital. Detective Turner estimated that 3822 West 76th Street was between 1 1/2 to 2 blocks away from the homicide location. The responding officers noted that the battery victim fit the description of the offender in the homicide case. He instructed the officers to recover the battery victim's clothing and to transport him to Area One for a further interview. He noted that the battery victim told officers that he received his injuries two blocks away, which was within the "circumference" of the homicide. Detective Turner learned the battery victim's name was Gerardo Cortina. While Cortina was still at the hospital, Robert was brought there to view Cortina, but Robert could not make a positive identification.

-4-

¶ 14        Detective Turner testified that Cortina was brought to Area One between 3:10 and 3:20 a.m. and placed in an interview room. Detective Turner spoke with Cortina. He advised Cortina of his rights and stated that Cortina became "very combative and said that he didn't want to talk." Detective Turner stated that Cortina asked for a cigarette and some time to think about what happened. Detective Turner next spoke with Cortina between 4:30 and 5 a.m. At that time, Cortina told him that he did not know anything and he had been with his friend, Carlos Gomez. Cortina gave defendant's address to the detective. Detective Turner then asked his sergeant to assign a couple detectives to go to defendant's house and "see if they could locate this Gomez and have him brought–see if he would come into the station to back up [Cortina's] story as to where [Cortina] was at the time of this incident." At that time, Detective Turner did not have any reason to believe defendant was associated with the homicide.

¶ 15        Detective Turner stated that four detectives went to defendant's house, but he was not one of them. He said that defendant was brought into Area One around 5:35 a.m. and placed in a conference room. Defendant was not handcuffed and the door was open. Detective Turner testified that this was "absolutely not" a room that he would put offenders in because it was not secure. Detective Turner first spoke with defendant around 6 a.m. when defendant asked for a cigarette and a pop. Detective Turner asked defendant if he knew Cortina and defendant responded that he did. He asked defendant if he had been with Cortina and defendant answered that they had been drinking.

¶ 16        At approximately 6:20 a.m., another detective, Detective Romic, spoke with Cortina. She then spoke to Detective Turner. She informed him that Cortina had said that he and defendant had gone out with the intention of stealing a car radio, but then defendant told Cortina that he wanted to "hit" a house, meaning enter a house and stick it up. Cortina said that they picked a house and defendant entered while Cortina waited in the front as a lookout. Detective Turner stated that prior to that statement, Cortina had not said anything to implicate defendant in a crime.

¶ 17        At that time, Detective Turner went to defendant, advised him of his rights and informed him that some allegations had been made against him. Defendant agreed to speak with him, but said that he did not know anything about the homicide and his mother and sister could back up his story that he was at home. Detective Turner then had detectives go to defendant's house to verify his alibi. Detective Turner also stated that defendant was transferred to a locked room around 6:40 a.m., after he spoke with Detective Romic.

¶ 18        Later, at approximately 9:20 a.m., Detectives McDonnell and Posluszny spoke with defendant. After they spoke with defendant, Detective Turner learned that defendant had made statements incriminating himself as being at the scene. According to Detective Turner, defendant was no longer considered a witness, but was now a suspect. Defendant was questioned throughout the day by other officers and assistant State's Attorneys. Defendant's clothing was recovered and forensic investigators were sent to defendant's house to process the location. Defendant also consented to give a buccal swab for DNA.

¶ 19        On cross-examination, Detective Turner stated that he was the lead detective on the case and had been working with Detective Kowalski. He admitted that he gave defendant his

*Miranda* rights when he first spoke to defendant as a precautionary measure and he "must have had some feelings that maybe he was a suspect. But he wasn't treated as a suspect." Detective Turner also testified that Cortina was drunk when Detective Turner first saw him. Detective Turner admitted that in Cortina's statement to Detective Romic, Cortina did not mention Robert pulling into the driveway. He also stated that no one tried to call defendant's house to ask if defendant would be willing to come to the station. When asked if defendant was free to leave when he was in the conference room, Detective Turner responded that it never came up because defendant did not ask to leave. On redirect, Detective Turner stated he considered defendant to be under arrest around 9:20 a.m., after he made statements to Detective Posluszny placing himself at the scene.

¶ 20        Detectives John Farrell and David Kowalski testified that on November 23, 2000, they received an assignment between 4:30 a.m. and 5 a.m. to pick up a witness named Carlos Gomez. They rode in one car and two other detectives, Detective McInerney and Detective Sesso, followed in another car. When they arrived at 3774 West 77th Place, Detectives Farrell and Kowalski went to the side door by the driveway and knocked. Bahena, defendant's sister, answered the door and asked what they wanted. Detective Farrell stated that he showed her his badge and explained he was a police officer and was looking for defendant. Bahena told them that defendant was there and sleeping in the basement. Detective Farrell asked if they could come in and she said yes. Bahena took them down to the basement and she turned on the lights.

¶ 21        Both detectives described the basement as an open area and they observed a set of bunk beds with a person in each bunk. When Bahena turned on the lights, the two males woke up. Bahena told them that defendant was "there" and defendant responded, "here." Detective Farrell stated that he did not speak with the person in the bottom bunk. He informed defendant that they were police officers and asked if he could speak with defendant. Defendant agreed to speak with him. Detective Farrell explained that someone at the police station had said he was with defendant earlier. Detective Kowalski asked defendant if he knew Cortina and defendant answered that he did. They asked defendant if he would come to the station and defendant agreed. Detective Farrell then spoke with Bahena as defendant got dressed. He told Bahena that defendant was going to 51st and Wentworth. He also spoke with her about the requirements to become a police officer. He gave Bahena a couple of his business cards. Detectives Farrell and Kowalski denied raising their voices in the basement or being confrontational with Bahena.

¶ 22        The detectives left with defendant. Both detectives stated that defendant was not handcuffed, but Detective Farrell did pat defendant down. Detective Kowalski stated that they transported defendant in an unmarked police car without a cage in it. They reached the Area One offices in about 20 minutes and took defendant to the second floor. While Detective Farrell stated that he placed defendant in an interview room, Detective Kowalski testified that Detective Farrell led defendant to a conference room. Detective Kowalski stated that the room is not used to hold offenders because it is not secure and cannot be locked from the outside. Both detectives stated that the door to the room defendant was in remained open. Detective Farrell told defendant he should call his mother, but defendant said he would call her later. He offered defendant something to eat or drink and defendant requested a soda,

which the detective got for him.

¶ 23    On cross-examination, Detective Farrell testified that detectives usually worked alone on midnight shifts, but Detectives Kowalski and Sesso were new and were assigned to go with another detective. Detective Farrell received the assignment to get defendant from his watch commander. He stated that the watch commander said, "Ernie's got a witness. Go see if you can find him." At defendant's house, he and Detective Kowalski went to the side door and the other detectives went to the back door. He stated that he did not tell Bahena that she had a right to refuse the officers entry. He also did not tell defendant that he had a right to refuse to go with them. Detective Farrell did not tell defendant that he could leave at any time. They entered the police station from the side door adjacent to the parking lot.

¶ 24    Detective Kowalski stated on cross-examination that his notes indicated that Robert's description of the offender was 5 feet 6 inches to 5 feet 7 inches, thin, 17 to 18 years old, with short black hair and wearing all black with a white insignia on a jacket, and dark pants. Detective Kowalski also testified that defendant left the conference room "periodically to use the washroom."

¶ 25    Detective John Posluszny testified that on November 23, 2000, he was working from 7 a.m. to 3:30 p.m. at Area One and assisted in the homicide investigation. At approximately 9:20 a.m., he was asked to interview defendant with Detective McDonnell. Defendant was in an interview room, but Detective Posluszny did not believe it was locked at that time. He stated that Detective McDonnell gave defendant his *Miranda* rights. Detective Posluszny identified a written copy of the *Miranda* warnings that was signed by defendant and both detectives. Defendant agreed to speak with them. Defendant then gave a statement implicating himself in the crime. Following that conversation, Detective Posluszny informed the other detectives working on the case.

¶ 26    Assistant State's Attorney (ASA) Leanna Rajk testified that on November 23, 2000, she was assigned to the felony review unit and was assigned to the homicide investigation around noon. She arrived at Area One at approximately 1 p.m. After reviewing reports, ASA Rajk spoke with defendant's sister and mother multiple times while at the police station. When she spoke to them, she asked how they had been treated by the police. Both said they had been treated fine. ASA Rajk also spoke with defendant several times. She testified that defendant did not tell her he had been dragged out of bed by the detectives and handcuffed. He did not tell her that he had been mistreated in any way.

¶ 27    The State rested on the motion. After arguments by the parties, the trial court denied defendant's motion to quash arrest and suppress evidence. The trial court noted that the parties agreed that probable cause did not exist at 5 a.m. when the detectives went to defendant's house. The court found that based on the totality of the circumstances, defendant's will was not overborne at 5 a.m. when he went to Area One with the detectives and was placed in a conference room. The court further concluded that defendant was placed under arrest at approximately 6:30 a.m. when he was moved to a second interview room as no reasonable person could believe that he or she was not under arrest at that point. The court held that the police had probable cause to arrest defendant because Cortina had given statements indicating defendant's involvement in the crime.

¶ 28    The following evidence was presented at defendant's March 2009 jury trial.

¶ 29    Robert Ralson (Robert) testified that on November 22, 2000, he lived with his sister Joyce Ralson at 3777 West 77th Street in Chicago. Ralson was 63 years old in November 2000. On November 22, 2000, Robert came home from work, ate dinner and left around 6:30 p.m. He returned home around 10:45 p.m. He noticed that all the lights were on in the house, which was unusual. When he went to enter the house, he found the side door unlocked. Robert went into his house and saw Ralson's legs on the floor. As he went to her, he saw that her pants and underwear were pulled down and a knife was stuck in her neck. Robert tried to comfort her. A few minutes later, he heard a noise and a man ran out of the back room toward Robert. Robert tried to stop him, but the man knocked him down and ran out of the house. Robert got up and saw the man run down the driveway and continue west down the block. Robert went back in the house and called 911.

¶ 30    Robert stated that the house was in disarray when he arrived home that night. The television was unplugged, drawers were open, and a jewelry box from the bedroom was in the living room. He recognized the knife in Ralson's neck as one of the knives from a block on the kitchen counter. Robert testified that on November 25, 2000, he viewed a lineup at Area One and identified defendant as the man he saw run out of his house after his sister was killed.

¶ 31    Officers Christine Chiagkouris-Spanos and Sophia Terrones were the first police officers at the scene. They observed the victim on the floor with a knife in her neck and the house in disarray. Robert spoke with the officers and gave a description of the offender. He described the offender as a male Hispanic, 5 feet 7 inches to 5 feet 9 inches, 18 to 20 years old with short black hair and wearing a black and white jacket and dark pants. The officers put out a flash message of the offender's description, the location of the offense, and what had occurred.

¶ 32    Another pair of police officers, Officers Joseph Smith and Sandra Threatt, responded to a radio call of a battery at 3822 West 76th Street at 10:15 p.m. At that address, the officers observed Gerardo Cortina bleeding from his head and called for an ambulance. Cortina told the officers he received his injuries two blocks away. Officer Smith heard the flash message about the homicide and realized that Cortina fit the description and his house was approximately three blocks from the Ralson residence. Officer Smith notified the police dispatch that he had a possible offender. Cortina was transported to Holy Cross Hospital. Officers took Robert to Holy Cross Hospital to view Cortina. Robert observed Cortina at the hospital, but Robert could not identify Cortina as the offender. After he was treated, Cortina was taken to Area One for questioning.

¶ 33    The parties stipulated that a doctor would testify that he treated Cortina at Holy Cross Hospital and Cortina received eight staples for the laceration to the back of the head. Cortina was combative and placed in restraints and his blood alcohol level was 0.33.

¶ 34    Detective Ernest Turner received an assignment at approximately 11 p.m. on November 22, 2000, to investigate Ralson's death. Detective Turner went to the scene and observed the victim's body on the floor with a knife stuck in her neck and her pants and underwear pulled down. Detective Turner also walked around the house and saw drawers pulled out and the

contents strewn around the house.

¶ 35    At Area One, Detective Turner questioned Cortina around 4:30 a.m. Cortina denied any involvement in the crime and said he had been drinking with defendant at 3774 West 77th Place. Detective Turner passed on this information to his supervisor, who assigned other detectives to locate defendant to confirm Cortina's alibi. Defendant was brought to Area One and Detective Turner spoke with defendant at approximately 6 a.m. Defendant told the detective that the night before he had been home drinking in the basement with Cortina and his cousin from 7 to 10 p.m. Defendant denied any wrongdoing.

¶ 36    Detective Jean Romic spoke with Cortina around 6:30 a.m. At first, Cortina said he did not remember anything, but then he told the detective that he went to the Ralson home with defendant and he acted as a lookout while defendant went inside the house. Cortina stated that defendant came out of the house 10 to 15 minutes later and said they needed to get out of there.

¶ 37    Detectives John Posluszny and Martin McDowell spoke with defendant at approximately 9:20 a.m. in an interview room. Defendant told the detectives that he went to the Ralson home with Cortina and that Cortina pushed the victim down while defendant looked for valuables. Defendant also said that he saw the victim lying on the floor with Cortina on top of her.

¶ 38    Detective David Kowalski spoke with defendant several times on November 23, 2000. He first spoke with defendant around 11:40 a.m. During that interview, defendant repeated his confession, but added that he may have touched one of the knives in the kitchen and he took a change purse from the house. Later, Detective Kowalski spoke with defendant around 2:55 p.m. At this interview, defendant told the detective that he took his BB gun from under his couch and gave it to Cortina before going to the Ralson house. When Ralson answered the door, defendant said that Cortina pointed the BB gun at her and told her to get on the ground. When she did not do that, Cortina pushed her down. Defendant also said that he tripped over something in the kitchen and might have accidentally touched Ralson's arm. Defendant told the detective that the victim was in a pool of blood, her pants and underwear were pulled down and she looked dead. Defendant took the BB gun home and placed it in heating vent in the basement. Detective Kowalski later retrieved the BB gun from the heating vent.

¶ 39    ASA Leanna Rajk testified that she arrived at Area One around 1 p.m. on November 23, 2000. She spoke with defendant at around 3:30 p.m. with Detective Turner present. During this interview, defendant admitted that he was the person who pushed Ralson down and raped her, but he denied knowing anything about her homicide. He said he saw the knife in her neck, but did not know how it had happened. Following this interview, ASA Rajk viewed the crime scene and spoke with additional witnesses including defendant's mother, sister and cousin as well as Cortina.

¶ 40    ASA Rajk next spoke with defendant at 7 a.m. on November 24, 2000. Defendant agreed to memorialize his statement on videotape and signed a consent to videotape form. ASA Rajk and Detective Kowalski were present when the videotaped statement was recorded. The videotaped statement was admitted into evidence and played for the jury.

¶ 41     In the videotaped statement, defendant stated that on November 22, 2000, Cortina came over around 6 p.m. and they started drinking a type of "Mexican tequila or something like that" that Cortina had brought over to defendant's house. Defendant's cousin Jesus Patino joined them during the evening. At some point, Cortina went to use the restroom and was gone for a while. Defendant went to check on him and Cortina was bleeding from the back of his head. Defendant told Cortina to go home and Cortina left. Defendant's mother then came downstairs and saw the blood and noticed that defendant "was kind of drunk." Defendant's mother got mad at defendant for drinking and poured the rest of the liquor on defendant. Defendant was mad and left. He then decided to make some money to buy some liquor. He returned home and got his BB gun. He walked around the block looking for a car radio, cell phone or someone with anything he could try to get. As he walked past the Ralson residence, he noticed "the lady" watching television inside the house. Defendant stated that he figured she was an "easy target" because she was old and would not fight back or give him any problems.

¶ 42     Defendant went to the side door and rang the doorbell. She answered the door, but did not open it all the way. Defendant "charged" into the house. Defendant said the woman reacted as though "she had a lot of money in there, like a lot of gold or something." Defendant figured there was something he could use. He told the woman to get down on the floor, but she did not want to get down. Since she was not afraid of the BB gun, defendant looked around for rope to tie her up or tape to tape her mouth. Instead, defendant found a knife and pointed it at her throat, but she continued to struggle. Defendant saw a couple scratches on her neck from where he had pressed the knife. Defendant realized the woman was not scared so he pushed her to knock her down and he fell on top of her. When they fell, the knife went slightly into her neck. Defendant stated that the woman's face looked scared and she was suffering. She was bleeding and defendant thought she was dying. Defendant then pushed the knife all the way through her neck.

¶ 43     Defendant realized he had done something bad and he would get caught. He said he started thinking he would never be with a woman again. He then pulled down her pants and started to have sex with her. He stated that he did not have an erection, but touched himself to get an erection. He then started having sex with her and said he also inserted his index finger. He said his erection lasted only five seconds and he stopped when he saw blood. Defendant stated he then started searching back bedrooms for jewelry and money, but did not find anything. He took a green liquor bottle from the refrigerator and $4 or $5. He started to unplug the television, but heard someone come into the house and "the old man" saw him. He pushed past the man, ran out of the side door and left.

¶ 44     When defendant arrived home, his mother asked how he got blood on his shirt. He told her it was from when Cortina fell. He gave her the shirt and did not know what happened to it. Defendant stated that he previously implicated Cortina because he thought Cortina had implicated him. He said he was telling the truth and wanted to take responsibility. He stated that no one had threatened or promised him anything to change his story.

¶ 45     Dr. John Scott Denton testified that he performed Ralson's autopsy. He stated that she died from a stab wound to her neck which severed her jugular vein and cut the carotid artery in half. He testified that the manner of death was homicide. He also testified that Ralson

suffered four injuries to her vagina, including a laceration of the vaginal lining and a bruise with some scraping of the back of the vaginal opening. He observed a large amount of bleeding associated with these injuries and were consistent with an individual forcing his penis and finger into her vagina. Dr. Denton stated that Ralson would have only lived for one or two minutes after the knife went through her jugular vein and carotid artery. He also noted that active bleeding stops when the heart stops beating.

¶ 46     Christine Prejean testified that she is a forensic scientist with the Illinois State Police crime lab. She tests for the presence of biological materials and performs DNA analysis. For this case, she received defendant's clothing for examination. She found two stains in which blood was indicated and two stains which were inconclusive as to the presence of vaginal secretions on defendant's underwear, and she cut out the stains for DNA analysis. Harold Johnson testified that he is a forensic biologist in DNA analysis with the Illinois State Police division of forensic services. He analyzed the samples from defendant's underwear and found a mixture of two people's DNA profiles in both samples. Ralson could not be excluded as the source of the female DNA profile in two samples. Of these two samples in which Ralson's DNA could not be excluded, approximately 1 in 3,700 black, 1 in 6,300 white, or 1 in 9,600 Hispanic unrelated individuals could not be excluded from having contributed to that DNA profile from the blood sample and approximately 1 in 2.6 billion black, 1 in 180 million white, or 1 in 170 million Hispanic unrelated individuals could not be excluded as having contributed to the human female DNA profile from the sample that was inconclusive for the presence of vaginal secretions.

¶ 47     Jesus Patino, defendant's cousin, and Cortina testified about the circumstances on the evening of November 22, 2000. Both men stated that they were drinking with defendant in his basement that night at around 7 p.m. Cortina fell and cut the back of his head, which bled. Cortina left. Cortina stated that he does not remember much of that night. He recalled going home and then the next thing he remembered was being in the hospital. His next memory was waking up in the police station. He could not remember what he told police. Patino testified that defendant left after his mother scolded him for drinking. Defendant returned a short time later, got his BB gun and left again. Patino then drove around the neighborhood looking for defendant with defendant's sister, but they did not find him and returned home.

¶ 48     The State rested its case and the defense moved for a directed finding, which was denied.

¶ 49     Defendant presented the testimony of Kimberly Hood Ryan. Ryan was a latent print examiner and she testified that none of the fingerprints recovered from the Ralson home matched defendant. Defendant's brother Jesus Gomez and his sister Maria Gomez Bahena gave testimony that was substantially similar to their previous testimony at the hearing on defendant's motion to quash arrest and suppress evidence. Bahena further testified that she drove around with her cousin Patino to look for defendant, but did not find him.

¶ 50     Following deliberations, the jury found defendant guilty of first degree murder, aggravated criminal sexual assault and home invasion. At the subsequent sentencing hearing, the trial court held that defendant was death eligible. The parties presented evidence in aggravation and mitigation. The trial court declined to impose the death penalty and sentenced defendant to natural life for first degree murder, 30 years' imprisonment for

aggravated criminal sexual assault, and 30 years' imprisonment for home invasion.

¶ 51    This appeal followed.

¶ 52    Initially, we note that defendant originally challenged the trial court's compliance with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)), but in his reply brief, defendant has conceded this issue in light of the Illinois Supreme Court's decision in *People v. Thompson*, 238 Ill. 2d 598 (2010). We need not consider this issue any further.

¶ 53    Defendant first argues that the trial court erred in denying his motion to quash arrest and suppress evidence because defendant was arrested before the existence of probable cause and the court used the wrong standard to determine whether defendant was arrested. The State maintains that defendant was voluntarily at the police station from 5:30 a.m. to 6:45 a.m., on November 23, 2000, when Cortina implicated defendant in the crimes. At that time, the police had probable cause to arrest defendant, which they did, and the trial court's ruling was proper.

¶ 54    In reviewing a trial court's ruling on a motion to suppress, this court applies a *de novo* standard of review. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001); see also *Ornelas v. United States*, 517 U.S. 690, 699 (1996). However, findings of historical fact will be reviewed only for clear error and the reviewing court must give due weight to inferences drawn from those facts by the fact finder. *Ornelas*, 517 U.S. at 699. Accordingly, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence; however, we will review *de novo* the ultimate question of the defendant's legal challenge to the denial of his motion to suppress. *Sorenson*, 196 Ill. 2d at 431. Here, defendant does not contest the trial court's factual findings, but claims that even accepting the detectives' testimony at the suppression hearing, he was arrested when the detectives came to his house at 5 a.m.

¶ 55    While defendant first asserts that the trial court used the wrong test in determining whether he was arrested, we may affirm the trial court's ruling on defendant's motion to suppress for any reason in the record, regardless of whether the trial court relied on this reason as a basis for its conclusion. *People v. Sims*, 167 Ill. 2d 483, 500-01 (1995).

¶ 56    Defendant contends that he was arrested without probable cause when the detectives came to his house at around 5 a.m. and asked him to come to the police station for an interview. He asserts that a reasonable person in defendant's position would not have believed that he was free to ignore the detectives' request.

¶ 57    "It is well settled that not every encounter between the police and a private citizen results in a seizure." *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006) (citing *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 215 (1984)). "Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Luedeman*, 222 Ill. 2d at 544 (citing *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982), and *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982)).

¶ 58    The relevant inquiry in determining whether a suspect has been arrested is whether, under

the circumstances, a reasonable person would conclude that he was not free to leave. *People v. Melock*, 149 Ill. 2d 423, 437 (1992); see also *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The reasonable person test is objective and presupposes an innocent person. *United States v. Drayton*, 536 U.S. 194, 202 (2002). "When one voluntarily accompanies police officers, he has not been arrested and has not been 'seized' in the fourth amendment sense." *People v. Redmond*, 341 Ill. App. 3d 498, 507 (2003).

¶ 59   Although no one factor is dispositive in making the determination of whether an arrest occurred, the court can consider factors including: (1) the time, place, length, mood, and mode of the encounter between the defendant and the police; (2) the number of police officers present; (3) any indicia of formal arrest or restraint, such as the use of handcuffs or drawing of guns; (4) the intention of the officers; (5) the subjective belief or understanding of the defendant; (6) whether the defendant was told he could refuse to accompany the police; (7) whether the defendant was transported in a police car; (8) whether the defendant was told he was free to leave; (9) whether the defendant was told he was under arrest; and (10) the language used by officers. *People v. Washington*, 363 Ill. App. 3d 13, 24 (2006); see also *Melock*, 149 Ill. 2d at 440.

¶ 60   Our consideration of these factors support a conclusion that defendant was not in custody prior to Cortina's implication of defendant and defendant's subsequent move to a secure interview room. Though the detectives' arrival at defendant's house at 5 a.m. might have suggested an arrest, the circumstances surrounding the encounter indicated otherwise. First, defendant voluntarily agreed to accompany the detectives to Area One for questioning. The detectives did not have their weapons drawn. Defendant was not handcuffed or otherwise restrained and accompanied the detectives in an unmarked police car without a cage. Defendant was not questioned for long periods of time and instead was left alone in an open conference room. Defendant was told that he could make phone calls and smoke cigarettes and was given a can of soda to drink. There was uncontested testimony from Detective Kowalski that defendant was able to periodically use the washroom. Defendant was never in the presence of an excessive amount of police officers. The record indicates that four detectives were involved in defendant's initial arrival at Area One and additional detectives were present at Area One, but defendant was questioned briefly by Detective Turner at around 6 a.m. Defendant was not restrained at any time prior to his arrest. He was not handcuffed at the station and was kept in a room with the door open. However, defendant was given his *Miranda* warnings by Detective Turner prior to his arrest. Advising a person of the Miranda rights is recognized as a common indicia of arrest although that fact alone is not conclusive to establishing an arrest. *People v. Barlow*, 273 Ill. App. 3d 943, 949 (1995).

¶ 61   The police were pursuing other suspects, specifically Cortina. Cortina fit Robert's description of the offender and Cortina had suffered a head injury, which he said occurred two blocks from his house. The Ralson home was within that vicinity. Cortina gave the police defendant's name as his alibi and they pursued that lead. The police had little information that would indicate any involvement of defendant, but they were following all possible leads. The detectives testified at the suppression hearing that they did not consider defendant a suspect when they brought him from his house to Area One to verify Cortina's alibi. Defendant was not told he could refuse to accompany the detectives, but he agreed to

come willingly. Additionally, defendant was not told he was free to leave the police station, but defendant did not ask to leave. While defendant claims he was under arrest when he was brought into the police station via a side door, we find this factor to have little weight as the detectives testified that the door was simply the closest entrance to the parking lot. While defendant was not told he could leave after he verified Cortina's alibi with Detective Turner, the defendant remained in the conference room. Defendant was only moved after incriminating statements were made by Cortina at around 6:30 a.m. In sum, we find the totality of these factors signals that defendant's presence with the police did not progress into an illegal arrest. Defendant was only at the police station for approximately one hour before he was moved to the secure interview room and that move was approximately 30 minutes after his first conversation with Detective Turner.

¶ 62    We also find that the police properly arrested defendant only after probable cause developed concerning defendant's involvement in Ralson's homicide. Probable cause is defined as reasonable ground to believe that the suspect has committed a felony. *Sims*, 167 Ill. 2d at 500.

¶ 63    " 'Mere suspicion is inadequate to establish probable cause, but the evidence relied upon by the arresting officer need not be sufficient to prove guilt beyond a reasonable doubt or even be admissible at trial. Technical rules do not govern the assessment of whether probable cause existed; rather, practical, commonsense considerations guide that determination.' " *People v. Jackson*, 391 Ill. App. 3d 11, 36 (2009) (quoting *People v. Wilson*, 260 Ill. App. 3d 364, 368-69 (1994)).

¶ 64    Probable cause developed in defendant's case once Cortina implicated defendant in a statement given to Detective Romic. Following that interview, Detective Romic informed Detective Turner of Cortina's statements placing defendant inside the Ralson home. Detective Turner then moved defendant from the open conference room to a more secure interview room. We point out that defendant had been at Area One for approximately one hour when probable cause arose and he was arrested. We find that sufficient probable cause arose following Cortina's statements and defendant was subsequently arrested at approximately 6:30 a.m. on November 23, 2000. Accordingly, we affirm the trial court's denial of defendant's motion to quash arrest and suppress evidence.

¶ 65    Next, defendant asserts that the State failed to prove him guilty beyond a reasonable doubt of aggravated criminal sexual assault because the State did not establish that Ralson was alive at the time of the sexual assault. The State maintains that Illinois law does not require the State to prove a sexual assault victim was alive at the time of penetration where the sexual assault and murder occurred during the same course of conduct.

¶ 66    We first consider whether Illinois law requires the State to prove that the victim was alive at the time of the sexual assault. Defendant argues that the Illinois Supreme Court has "emphasized that the crime of sexual assault is 'an offense against *a person*' " (emphasis in original) (*People v. Segara*, 126 Ill. 2d 70, 77 (1988)) and that "a defendant's treatment of a corpse can be 'hateful and evil,' but as a matter of law, incapable of inflicting pain upon the victim: 'One simply cannot consciously seek to inflict pain and suffering on a dead body, as a dead body feels nothing' " (see *People v. Nielson*, 187 Ill. 2d 271, 299 (1999)).

-14-

¶ 67    To prove aggravated criminal sexual assault, the State must prove that defendant committed criminal sexual assault and an aggravating factor is present. 720 ILCS 5/12-14 (West 2000). Here, the State proceeded to trial on two counts of aggravated criminal sexual assault, each based on a different aggravating factor. One count charged defendant with aggravated criminal sexual assault with the aggravating factor as "the accused displayed, threatened to use, or used a dangerous weapon, other than a firearm, or any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon" (720 ILCS 5/12-14(a)(1) (West 2000)), and the other charged the aggravating factor as "the victim was 60 years of age or over when the offense was committed" (720 ILCS 5/12-14(a)(5) (West 2000)).

¶ 68    Essentially, defendant asks this court to read an extra element into the aggravated criminal sexual assault statute, which is that the victim must be alive at the time of the sexual assault. However, we point out that the Illinois sexual assault statute does not require a living victim. See 720 ILCS 5/12-12(f), 12-13(a)(1), 12-14 (West 2000).

¶ 69    In *People v. Gutierrez*, 402 Ill. App. 3d 866 (2010), the third division of this court considered and rejected the same argument that defendant raises in this case. In that case, the victim's body was found in a crawl space in the defendant's apartment two days after the victim went missing. *Gutierrez*, 402 Ill. App. 3d at 872. The defendant's DNA was found on the victim's underwear, but the medical examiner did not find any injuries to the victim's vagina consistent with a sexual assault. *Gutierrez*, 402 Ill. App. 3d at 875. The *Gutierrez* court relied on the prior decision in *People v. Hendrix*, 250 Ill. App. 3d 88 (1993), in its analysis.

¶ 70    In *Hendrix*, the defendant asserted that the aggravated criminal sexual assault was not properly proven because the medical examiner could not establish that the sexual assault occurred before death. *Hendrix*, 250 Ill. App. 3d at 103. There, the victim was found 30 to 48 hours after her death. The medical examiner found two lacerations and bruising inside the victim's vagina and opined that the victim had been sexually assaulted, but could not determine when the sexual assault occurred. *Hendrix*, 250 Ill. App. 3d at 90.

¶ 71    The reviewing court in *Hendrix* considered the holding in *People v. Colley*, 188 Ill. App. 3d 817 (1989). In *Colley*, the defendant contended that because the victim suffered bodily harm after the sexual assault, he could not be found guilty of aggravated criminal sexual assault. The *Colley* court held:

>       "Under the instant circumstances, we will not draw a bright line between the ending of the sexual acts and the bodily harm occurring afterward, as that would defeat the statutory purpose of protecting victims from sex offenders. We find that the stab wounds occurred sufficiently close in time to the sexual acts that they can be said to have been committed during the course of the sexual assault." *Colley*, 188 Ill. App. 3d at 820.

¶ 72    Similarly, the court in *Hendrix* concluded that it would "not draw a bright line which would require the State in all similar cases to establish the precise time of death in order to prove a sexual assault upon a murder victim." *Hendrix*, 250 Ill. App. 3d at 103.

¶ 73    In *Gutierrez*, the defendant, like the defendant in the instant case, cited several out of

state cases in which courts have held that the victim of a sexual assault must be alive at the time of the sexual acts. *Gutierrez*, 402 Ill. App. 3d at 881 (citing *Doyle v. State*, 921 P.2d 901, 914 (Nev. 1996), *rev'd on other grounds by Kaczmarek v. State*, 91 P.3d 16 (Nev. 2004); *People v. Davis*, 896 P.2d 119, 151 n.20 (Cal. 1995); *State v. Perkins*, 811 P.2d 1142, 1150 (Kan. 1991); *State v. Holt*, 382 N.W.2d 679, 685 (Wis. Ct. App. 1985); *Commonwealth v. Sudler*, 436 A.2d 1376, 1379-80 (Pa. 1981); *Rogers v. State*, 890 P.2d 959, 969 (Okla. Crim. App. 1995); *People v. Hutner*, 530 N.W.2d 174, 176 (Mich. Ct. App. 1995) (*per curiam*).

¶ 74   Rather, the *Gutierrez* court looked to cases in which a defendant contended that he was not eligible for the death penalty as the defendant did not commit a murder in the course of another felony because the victim was already dead when the additional felony occurred. In *People v. Richardson*, the gunman announced a "stick up" at the same time he fired his first shot and then went through a cash register and ran from the store. *Richardson*, 123 Ill. 2d 322, 359 (1988). The supreme court held:

> "Just as the phrase 'in the course of' does not require that defendant complete one of the other felonies in order to be eligible for the death sentence [citation], we also believe that it does not require that the armed robbery commence prior to the fatal gunshot, since the precise timing of the offenses is not necessarily indicative of defendant's intent. The jury concluded beyond a reasonable doubt that defendant committed both a murder and an armed robbery, which offenses occurred essentially simultaneously. The trial testimony and verdicts sufficiently support the court's finding that the murder occurred 'in the course of' an armed robbery." *Richardson*, 123 Ill. 2d at 359.

¶ 75   Similarly, in *People v. Thomas*, the defendant contended that he could not be found guilty of murder in the course of arson or aggravated arson because the victim was already dead when he started the fire. *People v. Thomas*, 137 Ill. 2d 500, 533 (1990). The supreme court cited its previous holding in *Richardson* and again found that the defendant committed murder and arson " 'essentially simultaneously.' " *Thomas*, 137 Ill. 2d at 534. "It is not imperative that the State prove beyond a reasonable doubt that defendant formed the criminal intent to commit arson or aggravated arson before committing murder. It is sufficient that the State proved the elements of the crimes and the accompanying felonies were part of the same criminal episode." *Thomas*, 137 Ill. 2d at 534.

¶ 76   The court in *Gutierrez* found that the defendant committed the murder and sexual assault "essentially simultaneously" and that it was sufficient for the State to prove that the crimes occurred as part of the "same criminal episode." (Internal quotation marks omitted.) *Gutierrez*, 402 Ill. App. 3d at 883. The reviewing court noted that this conclusion was consistent with *Hendrix* and a majority of jurisdictions which have "adopted the 'ongoing criminal assault' rule. [Citation.]" *Gutierrez*, 402 Ill. App. 3d at 883.

¶ 77   *Gutierrez* also relied on the Missouri decision of *State v. McLaughlin*, 265 S.W.3d 257 (Mo. 2008). In *McLaughlin*, the reviewing court noted that the Missouri forcible rape statute, like the Illinois sexual assault statutes, does not address whether the victim must be alive at the time of penetration. *McLaughlin*, 265 S.W.3d at 268. The *McLaughlin* court adopted the

"ongoing criminal assault rule." "Under that rule, where the forcible compulsion that leads to the rape begins before the death of the victim, the defendant is guilty of rape even if the jury believes defendant killed the victim before penetration or before the sexual assault was concluded." *McLaughlin*, 265 S.W.3d at 268. The court, citing a decision of the Tennessee Supreme Court, further noted the public policy reasons behind this rule.

> " 'We are likewise unable to embrace the notion that the fortuitous circumstance, for the rapist, that death may have preceded penetration by an instant, negates commission of the crime of aggravated rape and reduces it to a relatively minor offense associated with erotic attraction to dead bodies. *Reading the 'live only' requirement into the statute encourages rapists to kill their victims*, in our opinion.' " (Emphasis in original.) *McLaughlin*, 265 S.W.3d at 269 (quoting *State v. Brobeck*, 751 S.W.2d 828, 832 (Tenn. 1988)).

¶ 78    The court in *McLaughlin* concluded that "[i]t is rape where defendant both kills and sexually assaults a victim in a single, continuous act, or in a series of closely related acts, and where, as a part of the course of conduct, defendant uses forcible compulsion against the victim, even if portions of the rape, including penetration, occur once the victim already has been killed." *McLaughlin*, 265 S.W.3d at 269.

¶ 79    After its discussion of these cases, the *Gutierrez* court held that "the State was not required to prove beyond a reasonable doubt that [the victim] was alive at the time defendant sexually assaulted her since the murder and sexual assault occurred 'essentially simultaneously.' " *Gutierrez*, 402 Ill. App. 3d at 885. The court pointed out that "Illinois has been following the majority of jurisdictions to address the ongoing criminal assault rule, as exemplified by Illinois cases involving other crimes." *Gutierrez*, 402 Ill. App. 3d at 885.

¶ 80    We agree with the conclusion reached in *Gutierrez*. While defendant asserts that *Thomas*, *Richardson*, and *Colley* are inapposite as these cases did not consider the precise issue before this court, the reasoning from these cases, *i.e.*, that the State only needs to prove the elements of the crimes and that there were committed as part of a same criminal episode, is clearly applicable to the issue before us. Here, defendant forced his way into Ralson's home and threatened her, first with a BB gun, then with a knife. He pushed her down and then stabbed the knife through her neck. Defendant then sexually assaulted Ralson. The State was not required to prove that Ralson was still alive when the actual penetration occurred "essentially simultaneously" as the homicide and as part of the "same criminal episode."

¶ 81    However, even if the State were required to prove that Ralson was alive when the sexual penetration occurred, the evidence was sufficient to establish this element beyond a reasonable doubt.

¶ 82    When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to

weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

¶ 83     The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who saw and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 280. However, the fact a judge or jury did accept testimony does not guarantee it was reasonable to do so. Reasonable people may on occasion act unreasonably. Therefore, the fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. *Cunningham*, 212 Ill. 2d at 280. Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. *Hall*, 194 Ill. 2d at 330.

¶ 84     The State presented evidence that Ralson's DNA could not be excluded from a sample found in defendant's underwear. Further, defendant admitted in his videotaped statement that he sexually assaulted Ralson after stabbing the knife through her neck. Defendant contends that defendant was already dead because Dr. Denton testified that Ralson would have lived for only one to two minutes after she was stabbed and defendant said in the videotaped statement that he did not have an erection, but had to arouse himself. Defendant surmises that this took longer than one to two minutes. However, Dr. Denton also testified that Ralson suffered vaginal injuries including lacerations and bruises. He stated that there was a large amount of bleeding inside Ralson's vagina associated with these injuries. Dr. Denton testified that a person stops bleeding when her heart stops beating. Based on this evidence, a rational trier of fact could have found that Ralson was alive at the time of the sexual assault. Accordingly, we affirm defendant's conviction for aggravated criminal sexual assault.

¶ 85     Finally, defendant contends that the trial court abused its discretion in sentencing him to natural life in prison in light of his limited, nonviolent criminal history, age and severity of the crime. The State maintains that the sentence was appropriate and entered after the trial court considered both aggravating and mitigating factors.

¶ 86     "It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant." *People v. Evans*, 373 Ill. App. 3d 948, 967 (2007). "An appellate court typically shows great deference to a trial court's sentencing decision since the trial court is in a better position to decide the appropriate sentence." *Evans*, 373 Ill. App. 3d at 967. "Accordingly, a trial court's sentencing decision is not overturned absent an abuse of discretion." *Evans*, 373 Ill. App. 3d at 967.

¶ 87     "The Illinois Constitution mandates the balancing of both retributive and rehabilitative purposes of punishment." *Evans*, 373 Ill. App. 3d at 967; see also Ill. Const. 1970, art. I, § 11. "The trial court is therefore required to consider both the seriousness of the offense and the likelihood of restoring the offender to useful citizenship." *Evans*, 373 Ill. App. 3d at 967. However, "[a] trial court is not required to give greater weight to the rehabilitative potential of a defendant than to the seriousness of the offense." *People v. Govea*, 299 Ill. App. 3d 76,

91 (1998). "In determining an appropriate sentence, the trial judge is further required to consider all factors in aggravation and mitigation, which includes defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age, as well as the nature and circumstances of the crime." *Evans*, 373 Ill. App. 3d at 967. "Generally, the trial court is in a better position than a court of review to determine an appropriate sentence considering the particular facts and circumstances of each individual case." *People v. Starnes*, 374 Ill. App. 3d 132, 143 (2007). "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation that is before it." *People v. Bowman*, 357 Ill. App. 3d 290, 303-04 (2005). "If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Starnes*, 374 Ill. App. 3d at 143 (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 88        The trial court sentenced defendant to natural life for one count of first degree murder. At the time of defendant's sentencing hearing, the sentencing range for first degree murder was 20 years to death. 730 ILCS 5/5-4.5-20(a) (West 2008).[1] The trial court found defendant to be eligible for the death penalty under section 9-1(b)(16) of the Criminal Code of 1961 because defendant had attained the age of 18, had been found guilty of first degree murder, and "the murdered individual was 60 years of age or older and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." 720 ILCS 5/9-1(b)(16) (West 2008).

¶ 89        At the sentencing hearing, the trial court heard testimony from several of defendant's family members and friends in mitigation. In aggravation, the State presented Robert's testimony and several victim impact statements from Ralson's nieces. Although the trial court found that defendant was eligible for the death penalty, the court declined to impose that sentence. The court made the following findings at defendant's sentencing hearing:

"This case, the facts of this case do justify [the death penalty.] And I shouldn't even attempt to describe the crime, the attorneys have, but it is an absolute nightmare what happened on November 22, 2000. The acts were monstrous, they speak for themselves and I won't try to describe them any further than to say that what happened to Ms. Ralson that night was an absolute nightmare, a horror, so while the facts do justify the ultimate sentence here, that's not the whole question here."

¶ 90        The court then stated:

"The issue is Carlos Gomez himself, and the facts regarding Carlos Gomez are undisputed. It's undisputed that he was a very young man at the night in question some eight years ago, it's undisputed that he was drinking, that he was drinking a lot, it's undisputed that he had no history of violence, he did have a history of criminal activity, there were reports submitted by the mitigation expert that he was beginning to spiral, he was just placed on probation a matter of months before this, he was

_____

[1]We acknowledge that the General Assembly in Public Act 96-1543, subsequently abolished the death penalty in Illinois. See Pub. Act 96-1543 (eff. July 1, 2011) (adding 725 ILCS 5/119-1).

definitely headed in the wrong way in a lot of ways, he just didn't have time yet to have a significant history of criminal activity.

It appears he was on his way, but that doesn't negate the fact that he didn't have a significant history of criminal activity. There's absolutely no history of violence. And as Mr. Dosch [defense counsel] points out, not only are we talking about before this incident but after this incident. He's been in Cook County Jail where he should be since this arrest, but I have not heard of any incident at Cook County Jail and I think that does speak volumes in this case.

I've heard from his family, I've heard from his loved ones and they point out that this is not the only Carlos Gomez, the Carlos Gomez on November 22, 2000, it's pretty clear that there's another Carlos Gomez, Carlos Gomez who has value, value to his family, value to his nephews and nieces and the rest of his family and he apparently has made a good impression on the individuals that he's come in contact with in Cook County Jail. In some ways he's made the best of his time in Cook County Jail, so I do find that the death penalty would not be the appropriate sentence in this case and I find that there exists mitigating factors that would preclude the imposition of the death penalty."

¶ 91 The trial court then concluded that the sentence of natural life in prison without parole was the appropriate sentence. Defendant asserts on appeal that the sentence of natural life is excessive and the trial court abused its discretion because his conduct did not rise to the level of brutal or heinous as stated in the statutory aggravating factor and the court did not sufficiently consider the mitigating evidence.

¶ 92 Based on the entire record before us and given the nature of the crime, we do not find that the trial court abused its discretion. The circumstances of this crime were, as the trial court described, "an absolute nightmare" and "monstrous." Here, defendant began his night consuming alcohol with his cousin and Cortina. After Cortina got injured and his mother scolded him, defendant got angry and left his house with the intention to commit a crime. He planned to break into a car or rob a person on the street, but instead he saw Ralson at home and decided she would be an easy target because she was an older woman. She was 63 years old.

¶ 93 He knocked on her door, armed with a BB gun, with the intention of scaring her into submitting while he robbed the house. However, Ralson was not timid and did not follow defendant's commands to get on her knees. Defendant then looked for rope to tie her up or something to tape her mouth shut, but ended up taking a knife from Ralson's kitchen. He pressed the knife to her throat to threaten her. He stated that he saw the scratches the knife left on her neck. He pushed her down and he fell on top of her. As they fell, the knife went partially into Ralson's neck and began to bleed. Defendant decided to push the knife all the way through her neck, severing her jugular vein and carotid artery.

¶ 94 Then, defendant, after realizing he had done something very bad, would likely be arrested and unable to be with a woman again, decided to sexually assault Ralson. He forced his penis and finger into Ralson's vagina. Dr. Denton testified that Ralson's vagina sustained lacerations and bruises. After the sexual assault, defendant ransacked Ralson's house looking

-20-

for valuables and money. He took a bottle of liquor from the refrigerator. When Robert arrived home, defendant pushed Robert down and ran out of the house. Defendant went home. Ralson's body was discovered by her brother with the knife stuck through her neck and her pants and underwear pulled down.

¶ 95      Contrary to defendant's contentions, the facts of this case were brutal and heinous. The trial court clearly weighed the aggravating factors of this case against the mitigating factors. The court noted defendant's age and lack of violent criminal history. The court also remarked on the testimony from his family members and friends that defendant was a good person. The trial court found the mitigating factors to be significant enough to preclude the imposition of the death penalty, but not enough to outweigh the aggravating factors sufficient for a sentence of natural life. While we are cognizant of defendant's age and criminal history, we cannot say the trial court abused its discretion in imposing a sentence of natural life.

¶ 96      Based on the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 97      Affirmed.